STATE of Wisconsin, Plaintiff-Appellant-Petitioner,

v.

Joshua O. KYLES, Defendant-Respondent.

Supreme Court

*No. 02–1540–CR. Oral argument November 6, 2003.—
Decided March 2, 2004.*

2004 WI 15

(Also reported in 675 N.W.2d 449.)

1

For the plaintiff-appellant-petitioner the cause was argued by *Stephen W. Kleinmaier*, assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager*, attorney general.

For the defendant-respondent there was a brief and oral argument by *Eileen A. Hirsch,* assistant state public defender.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. This is a review of an unpublished decision of the court of appeals affirming the order of the Circuit Court for Kenosha County, David M. Bastianelli, Judge.[1] The circuit court granted the motion of Joshua O. Kyles, the defendant, to suppress marijuana seized in a frisk, a protective search for weapons during a routine traffic stop. "Frisk" refers to "measures to determine whether the person is in fact carrying a weapon and to neutral-

---

[1] *State v. Kyles,* No. 02–1540–CR, unpublished slip op. (Wis. Ct. App. March 27, 2003).

ize the threat of physical harm."[2] The circuit court ruled that the police officer lacked an articulable, reasonable objective basis to believe that the defendant was armed and dangerous. Because it concluded that the protective search for weapons was invalid, the circuit court further concluded that no basis for the arrest existed and that the marijuana seized during the frisk was inadmissible evidence at the defendant's trial.

¶ 2. The court of appeals affirmed the circuit court's order suppressing the marijuana. Because we conclude that the totality of the circumstances was not sufficient to create reasonable suspicion to justify a protective search for weapons, we affirm the decision of the court of appeals.

¶ 3. The dispute in the present case centers on two issues: first, whether the circuit court erred in allowing the officer to testify about his belief that his safety was in danger[3] and further erred in considering the officer's belief that his safety was not in danger in deciding that no reasonable suspicion existed to justify the frisk; and second, whether the defendant's placing his hands in his pockets after being told by the officer to remove them is sufficient, in and of itself, to raise reasonable suspicion justifying a protective search for weapons. With regard to both issues, the State asserts that the court of appeals erred in the present case and in *State v. Mohr*[4] and asks us to overturn the *Mohr* decision.

---

[2] *Terry v. Ohio,* 392 U.S. 1, 24 (1968).

[3] *Terry,* 392 U.S. at 27.

[4] *State v. Mohr,* 2000 WI App 111, 235 Wis. 2d 220, 613 N.W.2d 186.

¶ 4. We conclude that an officer's belief that his safety or that of others was in danger when confronting an individual is not a prerequisite to conducting a protective search for weapons. We do not accept the State's position that under no circumstances may an officer be questioned about his or her belief about whether his or her safety or that of others was in danger at the time the frisk was conducted. We conclude that officers may be so questioned because officers may draw reasonable inferences from the facts in light of their experiences. A court may therefore consider an officer's belief that his or her safety or that of others was or was not in danger in determining whether the objective standard of reasonable suspicion was met.

¶ 5. We conclude, as do the State and the defendant, that an individual's failure to obey the direction of an officer to keep his hands in the officer's sight is a significant factor to consider in determining the reasonableness of an officer's suspicion that the individual being frisked might be armed and dangerous. We decline to hold, as the State urges, that the requirement of specific and articulable facts providing reasonable suspicion is automatically satisfied when a person fails to comply with an officer's order to keep his hands out of pockets that could be concealing a weapon. Circuit courts are aptly positioned to decide on a case-by-case basis, evaluating the totality of the circumstances, whether an officer had reasonable suspicion to justify a protective search in a particular case. Finally, we decline the State's invitation to overturn the *Mohr* decision.

¶ 6. The defendant challenges the officer's protective search for weapons conducted on him as a violation of his Fourth Amendment guarantee that persons be free from "unreasonable searches."[5] In reviewing an order granting a motion to suppress evidence obtained during a protective search for weapons, we uphold a circuit court's findings of fact unless they are against the great weight and clear preponderance of the evidence.[6] The facts in the present case are undisputed.

¶ 7. Whether the facts satisfy the constitutional requirement for performing a protective search for weapons—that an officer must have reasonable suspicion that a person may be armed and dangerous to the officer or others—is a question of constitutional law for this court to decide.[7] We are not bound by a circuit court's or court of appeals' decision on this question of law, but we benefit from the analyses of these courts.[8]

¶ 8. The controlling principles of constitutional law applicable to the "reasonable suspicion" standard of a protective search for weapons are firmly established, and neither party challenges these principles. The

---

[5] The Fourth Amendment to the U.S. Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const., Art. IV.

[6] *State v. Williamson,* 113 Wis. 2d 389, 401, 335 N.W.2d 814 (1983).

[7] *Id.*

[8] *State v. Jackson,* 147 Wis. 2d 824, 828, 434 N.W.2d 386 (1989).

parties disagree, in the present case, over whether the facts satisfy the constitutional standard of "reasonable suspicion."

¶ 9. The touchstone for examining a frisk is the United States Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968). In *Terry*, the Court authorized a protective search of an individual suspected of criminal activity in order "to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."[9] In order to limit the state's power to intrude upon individual rights, however, the Court held that to justify a particular intrusion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion."[10] The Court went on to explain that "due weight must be given, not to his [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."[11]

¶ 10. The reasonableness of a protective search for weapons is an objective standard, that is, "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety and that of others was in danger" because the individual may be

---

[9] *Terry*, 392 U.S. at 24; *State v. McGill*, 2000 WI 38, ¶ 22, 234 Wis. 2d 560, 609 N.W.2d 795.

[10] *Terry*, 392 U.S. at 21. *See McGill*, 234 Wis. 2d 560, ¶ 22; *State v. Morgan*, 197 Wis. 2d 200, 208–09, 539 N.W.2d 887 (1995); *State v. Richardson*, 156 Wis. 2d 128, 139, 456 N.W.2d 830 (1990).

[11] *Terry*, 392 U.S. at 27.

armed with a weapon and dangerous.[12] In determining whether a frisk was reasonable, a court may look "to any fact in the record, as long as it was known to the officer at the time he conducted the frisk and is otherwise supported by his testimony at the suppression hearing."[13]

## II

¶ 11. We first state the relevant undisputed facts; we will expound upon the facts later in the opinion as we discuss the arguments of the parties. At approximately 8:45 p.m. on December 23, 2001, a police officer pulled over a vehicle for the traffic violation of operating a vehicle without headlights after dark. The defendant was a passenger in the vehicle. No one in the vehicle was suspected of a crime.

¶ 12. A second officer came to the scene of the stop. At the request of one of the officers, the defendant exited the vehicle to allow the police to perform a consensual search of the vehicle. The officer's request to the defendant to exit the vehicle and the defendant's consent to the search of the vehicle have not been challenged.

¶ 13. The defendant was wearing a "big, down, fluffy" coat, suitable for the cold winter weather that night. The officer testified that when the defendant exited the vehicle he was behaving suspiciously: he appeared nervous, looked around, and was "kind of trying to keep his hands in his pockets." The officer also testified that the defendant did not try to flee.

---

[12] Wis. Stat. § 968.25; *Terry*, 392 U.S. at 27; *McGill*, 234 Wis. 2d 560, ¶¶ 19, 23.

[13] *McGill*, 234 Wis. 2d 560, ¶ 24.

¶ 14. When the defendant exited the vehicle, he placed his hands in his coat pockets. The officer directed the defendant to remove his hands from his pockets. As the defendant was walking, at the officer's request, to the rear of the car, the defendant again placed his hands in his pockets. Again the officer told the defendant to "keep your hands out of your pockets." Again the defendant complied and removed his hands from his pockets. The officer testified that the defendant's placement of his hands in his pocket was "like a nervous habit. He'd put them in, take them out, put them back in, take them out."

¶ 15. About four to eight seconds elapsed between the time the defendant exited the vehicle and the time the officer conducted a frisk of the defendant. Only one officer performed the protective search for weapons and testified about it. No weapon was found on the defendant's person; however, marijuana was found.

### III

¶ 16. We now address the question whether the totality of the circumstances supports the conclusion that the officer had reasonable suspicion to justify the protective search for weapons on the defendant.

¶ 17. The parties disagree about the weight to be given the following six factors that compose the totality of the circumstances in the present case:

(1) The officer testified that he "didn't feel any particular threat before searching" the defendant.

(2) The defendant, during a four-to-eight-second interval, at least twice inserted his hands into and removed his hands from his coat pockets

after being directed by the officer to remove his hands from his pockets;

(3) The defendant wore a big, fluffy down coat in which a weapon could be secreted;

(4) The defendant appeared nervous;

(5) The stop occurred at night; and

(6) The officer testified, in response to a question about the criminal activity in the area of the stop, that it was "pretty active."

¶ 18. We address each of these six factors in turn and then examine them in their totality.

(1)

¶ 19. The principal issue in this case, according to the State, is that the circuit court erred in allowing the officer to testify that he did not feel any particular threat that the defendant was armed before searching the defendant and erred in considering the officer's lack of belief that his safety was in danger.

¶ 20. On cross-examination the officer was asked: "And you didn't feel any particular threat before searching Mr. Kyles [the defendant], correct?" The officer answered: "No, I did not."

¶ 21. The State first argues that the circuit court misinterpreted the officer's testimony. When asked why he conducted the frisk, the officer responded: "Cause he was acting kind of nervous, suspicious, and I was looking for the possibility that he may have weapons on him." The State contends that the officer conducted the frisk because he thought the defendant may have had a weapon.

12

¶ 22. The State's principal position is not, however, that the circuit court misinterpreted the officer's testimony. The State's principal position is two-fold: First, the State argues that an officer's "subjective fear of the suspect"[14] being searched, as the state poses the issue, is not a prerequisite to a valid frisk. Second, the State argues that this court should bar any questioning of an officer about his or her "subjective fear of the suspect" frisked and should bar a court from considering an officer's "subjective fear of the suspect."

¶ 23. As to the State's first position, we agree with the State that an officer's belief that his or her safety or that of others is in danger because the individual may be armed is not a prerequisite to a valid frisk. Because an objective standard is applied to test for reasonable suspicion, a frisk can be valid when an officer does not actually feel threatened by the person frisked or when the record is silent about the officer's subjective fear that the individual may be armed and dangerous. The law is very clear on this point.[15]

¶ 24. Numerous courts have considered the question whether a law enforcement officer's fear of a suspect's being armed is dispositive in evaluating the reasonableness of the officer's frisk, and with limited

---

[14] The State summarizes the officer's testimony that he didn't feel any particular threat as a statement raising the issue of "subjective fear of the suspect." *See* Brief and Appendix of Plaintiff-Appellant-Petitioner, *passim.*

[15] Wayne R. LaFave, *Search and Seizure* § 9.4(a) at 139 (3d ed. 1996) ("there is no requirement that an actual suspicion by the officer be shown"); § 9.5(a) at 253 ("it is not essential that the officer actually have been in fear").

13

exceptions,[16] most courts have concluded that it is not. The lead case appears to be the Fifth Circuit's decision in *United States v. Tharpe*, 536 F.2d 1098 (5th Cir. 1976) (reversed on other grounds by *United States v. Causey*, 834 F.2d 1179 (5th Cir. 1987)), that even though an officer's "subjective feelings may have been equivocally expressed . . . [w]e know of no legal requirement that a policeman must feel 'scared' by the threat of danger. Evidence that the officer was aware of sufficient specific facts as would suggest he was in danger satisfies the constitutional requirement. . . . [N]o purpose . . . would be served by insisting on the retrospective incantation 'I was scared.' Some foolhardy policemen will never admit fear. Conversely, reliance on such litany is necessarily prone to self-serving rationalization by an officer after the fact. It would be all too easy for an officer to belatedly recite that he was scared in situations where he neither had any reason to be scared, nor was indeed scared."[17] Many cases have adhered to the *Tharpe* decision.[18]

---

[16] Drawing on the language of various decisions, at least one court has stated that an officer's lack of subjective concern for his or her safety will prevent the facts from rising to the level of reasonable suspicion. *See United States. v. Lott*, 870 F.2d 778, 784 (1st Cir. 1989) ("an officer cannot have a reasonable suspicion that a person is armed and dangerous when he in fact has *no* such suspicion") (emphasis in original). We do not think this is an accurate statement of the law and agree with the numerous cases, discussed herein, that hold otherwise.

[17] *Tharpe*, 536 F.2d at 1100–01.

[18] *See, e.g., United States v. Menard*, 95 F.3d 9, 11 (8th Cir. 1996) (although defendant argued that officer "evidenced little if any concern for his safety . . . . Fourth Amendment reasonableness does not require 'that a policeman must feel "scared" by the threat of danger.' "); *United States v. Bonds*, 829 F.2d 1072,

¶ 25. We agree with the rule set forth in *Tharpe* (relied upon heavily by the State) that an officer need not feel scared and need not believe that his or her safety or that of others is in danger because the individual is armed in order to conduct a valid weapons frisk.

¶ 26. According to the State, the court of appeals in *Mohr*, especially at paragraphs 15 and 26,[19] concluded that an officer's belief that his safety or that of others is threatened by a suspect is a prerequisite for conducting a protective weapon search. The State urges us to overturn the court of appeals' decision in *Mohr*.

¶ 27. We do not agree with the State that the *Mohr* decision stands for the proposition, or should be read to hold, that an officer must be fearful of the suspect being frisked in order for the frisk to be valid. The State has, in our opinion, mischaracterized the

1074–75 (11th Cir. 1987) (follows *Tharpe*); *United States v. Flett*, 806 F.2d 823, 828 (8th Cir. 1986) (fact that suspect made no threatening moves or that officer did not notice bulge does not lessen reasonableness of officer's actions); *United States v. Bell*, 762 F.2d 495, 500 n.7 (6th Cir. 1985) (citing *Tharpe* for proposition that although officer did not view suspect as security risk, focus should be on whether officer reasonably perceived subject of frisk as potentially dangerous); *Estep v. Peace*, 1997 WL 33564933, *5 (N.D. Tex. Oct. 3, 1997) (same); *People v. Galvin*, 535 N.E.2d 837, 843 (Ill. 1989), (although "an officer's subjective feelings may not dictate whether a frisk is valid," officer's testimony as to his subjective feelings is one factor that may be considered in totality of circumstances known to officer at time of frisk); *State v. Evans*, 618 N.E.2d 162, 169–70 (Ohio 1993) (follows *Tharpe*); *State v. Roybal*, 716 P.2d 291, 293–94 (Utah 1986) (same); *State v. Carter*, 707 P.2d 656, 659 (Utah 1985) (same).

[19] *State v. Mohr*, 2000 WI App 111, 235 Wis. 2d 220, 613 N.W.2d 186.

reasoning of the court of appeals' decision in *Mohr*. *Mohr* does not hold that an officer's belief that his or her safety or that of others is in danger because the individual may be armed is a prerequisite to a valid frisk. *Mohr* does not substitute an officer's lack of subjective fear of the individual being frisked for the objective test applicable to a frisk.

¶ 28. *Mohr* begins and ends with a reference to the objective standard, as do the decisions of the circuit court and court of appeals in the present case. The court of appeals in *Mohr* reviewed all of the facts and circumstances, including the officer's conduct and the officer's lack of belief that his safety was threatened by the individual frisked, and concluded that no "reasonably prudent person in the officer's position would believe that his or her safety was in danger."[20]

¶ 29. To the extent that *Mohr* did discuss whether an officer's belief that his safety was in danger may be considered in the totality of the circumstances, it did so in apparent response to the State's contention that the officer searched the defendant in *Mohr* for safety reasons and only to reiterate that "an officer's concern for his or her safety during a traffic stop is a legitimate and weighty consideration."[21] The *Mohr* court recognized that an officer's concern for his or her safety, or lack thereof, is only one part of the rich tapestry of factors that is the totality of the circumstances inquiry.

¶ 30. The State's contention that *Mohr* requires that an officer have an actual fear of the person frisked for the search to be valid is an erroneous reading of *Mohr*, and we disavow any such reading that might be

---

[20] *Mohr*, 235 Wis. 2d 220, ¶ 16.

[21] *Id.*, ¶ 14.

mistakenly drawn from *Mohr*. We repeat: No legal requirement exists, for a court to hold that a frisk was valid, that an officer have a "subjective fear" of the person frisked, that is, that an officer believe that his or her safety or that of others is in danger because the individual may be armed and dangerous.[22]

---

[22] Because of the State's mischaracterization of *Mohr,* the State argues that *Mohr* conflicts with the United States Supreme Court's decision in *Whren v. United States*, 517 U.S. 806 (1996). In *Whren,* the Court stated:

> The fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify the action. . . . [T]hese cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

517 U.S. at 813. More recently the Court applied *Whren* to a situation where the standard was reasonable suspicion rather than probable cause, *United States v. Knights,* 534 U.S. 112, 122 (2001). Properly interpreted, *Mohr* does not conflict with these cases.

These cases stand for the proposition that the actual motivation of an officer does not determine the constitutionality of a stop.

The defendant in the present case concedes, and we agree, that there is no legal requirement that an officer be afraid for his or her safety or that of others. The defendant argues only, and we agree, that the officer's belief that his or her safety or that of others was in danger is one factor that a circuit court may consider in evaluating the totality of the circumstances in examining the validity of a frisk. The officer's motivation or intent to find contraband rather than weapons is not an issue in the present case.

17

¶ 31. In its second position, the State goes a step further and asks us to bar counsel from questioning an officer regarding his or her fear or belief that his or her safety or that of others was in danger when confronting an individual because the individual may be armed and to bar courts from considering such testimony.

¶ 32. The defendant argues that if this court adopts the State's reasoning, a substantial amount of case law that has developed in the wake of *Terry* may be undercut. The defendant contends that under the State's position, for example, an officer's particular training, experience, and perceptions cannot be considered in determining the reasonableness of a protective search for weapons.[23] The State disagrees with the defendant about the admissibility of the other factors if its position were adopted.

¶ 33. We need not address the defendant's litany of unintended consequences of the State's position. We do not accept the State's position that under no circumstances may an officer be questioned about his or her fear or belief that his or her safety or that of others was endangered by the person because the person may be armed. We do not view the State's proposed bright-line, per se rule to be a correct or prudent interpretation of the law.

¶ 34. Judging from the reported cases, law enforcement officers are frequently questioned about whether they believed their safety or that of others was endangered by the individual frisked because the individual may have been armed. Although cases hold, as we do, that an officer's response to such a question is

---

[23] *See United States v. Arvizu,* 534 U.S. 266, 270–71 (2002) (officer's subjective interpretation of the facts is considered as part of the totality of circumstances).

not determinative of the reasonableness of the frisk, they also hold that a court may nevertheless consider a police officer's fear or belief that his or her safety or that of others was in danger as part of the totality of the circumstances.

¶ 35. For instance, in *United States v. Michelletti*, 13 F.3d 838 (5th Cir. 1994) (en banc), the Fifth Circuit recognized that "under clever cross-examination" the officer testified that, "before the patdown, he had no specific reason to believe Michelletti was armed."[24] The circuit court concluded that "[t]his statement somewhat detracts from our position [that the officer's suspicion was reasonably aroused] but does not prove that Officer Perry had no reason to be concerned about Michelletti."[25] The Fifth Circuit then went on to cite the language in *Tharpe*, quoted above, approvingly.

¶ 36. In *United States v. Baker*, like *Tharpe* and *Michelletti* a Fifth Circuit case, the court concluded that it "never held that an officer's objectively reasonable concern for his safety does not justify a protective *Terry* pat down for weapons where the officer has no actual fear for his safety."[26]

¶ 37. Other jurisdictions also conclude that if an officer is questioned about his or her fear or belief that his or her safety or that of others was in danger because the person may have been armed, the response may be considered as part of the totality of the circumstances.

---

[24] *Michelletti*, 13 F.3d 838, 842 (5th Cir. 1994).

[25] *Id.*

[26] *United States v. Baker*, 47 F.3d 691, 694 (5th Cir. 1995). The *Baker* court stated that in *Michelletti*, the court "took note of the officer's testimony that he had no specific reason to believe that the defendant was armed but went on to find that several other factors surrounding the encounter satisfied the reasonable suspicion standard."

These jurisdictions conclude that an officer's own evaluation of the circumstances may provide insight to factor into the objective analysis.[27] We agree with these jurisdictions that although an officer's perception is not determinative in determining the reasonableness of the frisk, it may be of some assistance to a court in weighing the totality of the factors.

¶ 38. The State cites no case directly on point that forecloses consideration of an officer's subjective apprehension that an individual may be armed as part of the totality of the circumstances inquiry.[28] One case cited

---

[27] *See, e.g., People v. Gonzalez*, 704 N.E.2d 375, 384 (Ill. 1998) (an officer's subjective feeling is one of the factors that may be considered in the totality of the circumstances under *Terry*).

The Utah Supreme Court recently wrote that although

an officer's subjective belief alone is insufficient to validate or invalidate a *Terry* frisk, to completely disregard an officer's subjective belief excludes a potentially important element of the analysis. In stating that subjective belief alone is not enough to justify a frisk, the United States Supreme Court appears to recognize that subjective belief may be one of the factors in determining the reasonableness of an officer's decision to perform a *Terry* frisk. In fact, in other situations, an officer's subjective factual determination based on experience and specialized training has been given due weight as part of the objective analysis.

*State v. Warren*, 78 P.3d 590, 596 (Utah 2003).

[28] The State cites *State v. Dumas*, 786 So. 2d 80, 81–82 (La. 2001). In that case the court stated that "the court of appeal erred in according *substantial weight* to the testimony of the officers at the suppression hearing that subjectively they were not afraid of respondent" and that "[t]he relevant question is not whether the police officer subjectively believes he is in danger, or whether he articulates that subjective belief in his testimony at a suppression hearing, but 'whether a reasonably prudent man in the circumstances would be warranted in the belief that

20

by the State, the *O'Hara* case, may be read (with a stretch) to imply that a court should not consider an officer's testimony relating to his lack of apprehension for his personal safety. In *O'Hara v. State*, 27 S.W.3d 548 (Tex. Crim. App. 2000), the Texas Court of Criminal Appeals concluded that whether the officer "was afraid or was not afraid" that the suspect was armed was "irrelevant" under an objective analysis.[29] The *O'Hara* case has not been read to stop law enforcement officers in Texas who frisked an individual from being asked in court if they were concerned about their safety at the time of the frisk.[30]

¶ 39. In sum, the State cites no case supporting its proposed per se bright-line rule that this court should bar any questioning of an officer about his or her

his safety or that of others was in danger.' " (emphasis added). The court did not conclude that the officer's testimony could not be considered.

The State also cites *United States v. Gonzalez,* 954 F. Supp. 48, 50 (D. Conn. 1997). In that case, the court stated that an objective test is the correct one for determining the reasonableness of a search under *Terry* but did not preclude the possibility that such a search may "include[] a subjective component."

The State cites two additional cases for the proposition, with which we agree, that an officer's subjective feelings do not dictate the validity of a frisk. *See People v. Galvin,* 535 N.E.2d 837, 843 (Ill. 1989); *State v. Roybal,* 716 P.2d 291, 293 (Utah 1986). The Illinois Supreme Court in *Galvin* and the Utah Supreme Court in *Warren,* 78 P.3d 590, a case subsequent to *Roybal,* explained that an officer's subjective perceptions may nevertheless be taken into account.

[29] *O'Hara v. State,* 27 S.W.3d 548, 551 (Tex. Crim. App. 2000).

[30] *See, e.g., Jones v. State,* 69 S.W.3d 275, 278 (Tex. App. 2002).

"subjective fear of the suspect." We conclude that an officer may be questioned about his or her fear or belief that his or her safety or that of others was in danger because the person frisked may have been armed and that a court may consider an officer's fear or belief that his or her safety or that of others was in danger in determining whether the objective standard of reasonable suspicion was met under the totality of the circumstances. An officer's legal and subjective conclusions are, however, not determinative of the validity of the frisk; a court applies an objective standard to the facts known to the officer. The officer's fear or belief that the person may be armed is but one factor in the totality of the circumstances that a court may consider in determining whether an officer had reasonable suspicion to effectuate a protective weapons frisk. Sometimes an officer's perceptions will help sustain the objective reasonableness of an officer's frisk. Other times, these perceptions may undercut a conclusion of reasonableness.[31]

(2)

■■■■

¶ 40. The State argues that the "primary factor" indicative of reasonable suspicion in the present case is that during a four-to-eight-second interval the defendant at least twice inserted his hands into the pockets of his coat. The defendant put his hands in his pockets at least once again after the officer requested that the defendant remove his hands from his pockets. We recognize, as do the State and the defendant, that an individual's failure to obey the direction of an officer to

---

[31] *See* LaFave, *supra* note 15, § 3.2(c) at 40–41 (discussing probable cause).

keep his hands in the officer's sight is a significant factor to consider in determining the reasonableness of an officer's suspicion that an individual might be armed and dangerous.

¶ 41. Officers need to see a person's hands so that they can determine whether the individual is reaching for a weapon. Officers have a legitimate, objective concern for their own safety when an individual reaches into his pockets. This concern is heightened when individuals place their hands in their pockets after being instructed to remove their hands from their pockets. Individuals are ill-advised in their encounters with law enforcement officers, whether for violations of traffic laws or criminal laws, to refuse to remove their hands from their pockets when requested to do so by an officer.

¶ 42. This court has stated that an officer's testimony that a suspect twitched and acted nervous with his hands when validly pulled over for violating a traffic law "in particular justified the officer's suspicions about the presence of a weapon and supports the reasonableness of the frisk."[32] In another case, this court concluded that a suspect's actions were threatening when the suspect turned away from the officer in the dark so that the officer could not see the suspect's hands.[33]

---

[32] *McGill*, 234 Wis. 2d 560, ¶ 31. In *McGill*, the suspect was a driver who had violated a traffic law, not a passenger, and the suspect had engaged in evasive driving maneuvers after the police officer turned on his vehicle's lights to perform the stop. In addition, the suspect was described as "unusually nervous" and "smell[ing] of intoxicants and illegal drugs." *Id.*, ¶¶ 29, 31. In short, the totality of the circumstances in *McGill* was quite different from the facts in this case.

[33] *Williamson*, 113 Wis. 2d at 402. Professor LaFave comments that among the circumstances courts have in the past

¶ 43. These cases are, according to the State, contravened by *State v. Mohr,* 2000 WI App 111, 235 Wis. 2d 220, 613 N.W.2d 186. The State urges us to overturn the *Mohr* decision for failing to appreciate the danger posed to an officer by an individual who refuses to remove his hands from his pockets contrary to police orders.

¶ 44. In *Mohr,* a passenger in a car was twice ordered by police to remove his hands from his pockets. Each time the passenger, who was described as being nervous and resistive, refused to do so. The protective search for weapons occurred 25 minutes after the stop began. Examining the totality of the circumstances, the court of appeals held in *Mohr* that the protective search for weapons was not supported by reasonable suspicion.[34]

¶ 45. The State repeatedly asserts that *Mohr's* facts were sufficient to justify reasonable suspicion. The State asserts that the *Mohr* decision erred "in concluding that a nervous suspect keeping his hands in his pockets contrary to police orders fails to provide reasonable suspicion that the suspect is dangerous."[35] The State further asserts that the circuit court in the present case was misled by *Mohr* to believe it could not conclude that there was reasonable suspicion to support the protective frisk.[36]

---

found sufficient to justify a pat down search are "an otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed [or] an otherwise inexplicable failure to remove a hand from a pocket." LaFave, *supra* note 15, § 9.5(a).

[34] *Mohr,* 235 Wis. 2d 220, ¶ 7.

[35] Brief and Appendix of Plaintiff-Appellant-Petitioner at 8.

[36] The circuit court stated it was bound by the *Mohr* case even though it disagreed with it. The circuit court also stated

¶ 46. The State is correct that *Mohr* stands in contrast with other cases in which courts have concluded that a person's refusal to remove his hands from his pockets was sufficient under the totality of the circumstances of those cases to constitute reasonable suspicion justifying a protective weapons search. Circumstances vary from case to case. In *Mohr*, the court of appeals considered the position of the defendant's hands as one of the factors among the totality of the circumstances to be considered. The court of appeals considered the duration of the stop and the delay before the police officer performed the frisk for weapons and concluded as a matter of law that the officer did not have reasonable suspicion justifying the frisk in that case.

¶ 47. To avoid future decisions like *Mohr* and the decisions of the circuit court and court of appeals in the case at bar, the State asks that we hold that "the requirement for specific and articulable facts providing reasonable suspicion is satisfied when a person fails to comply with a police order to keep his hands out of pockets that could be concealing a weapon."[37] Despite its assertions that it is not seeking a per se rule, we view the State as urging this court to adopt a per se "hands-in-the-pockets rule" that reasonable suspicion always exists when individuals place their hands in their pockets after an officer directs that they not do so.

that "there [was] no question in [its] mind [that the defendant's actions were not] even as aggravated as *Mohr* was." The circuit court concluded, "[T]here's no articulable, objective information here that there was [sic] indications that he [the defendant] was in fact dangerous as opposed to frisking him for officer safety."

[37] Reply Brief of Plaintiff-Appellant-Petitioner at 9.

25

¶ 48. We do not adopt, as the State urges, a per se rule to govern these situations. None of the decisions cited by the State establishes a per se rule that an individual's "hands in pockets" automatically establishes reasonable suspicion of dangerousness. Furthermore, a blanket exception to the requirement of an individualized suspicion of dangerousness ordinarily violates the basic principles of the Fourth Amendment.[38]

¶ 49. We adhere to our holdings in previous cases that a circuit court must consider under the totality of the circumstances whether an individual's refusal to comply with an officer's direction to the individual to remove his hands from his pockets is sufficient to trigger reasonable suspicion to conduct a protective search. Circuit courts are aptly positioned to decide on a case-by-case basis, evaluating the totality of the circumstances, whether an officer had reasonable suspicion to effectuate a protective search for weapons in a particular case.

¶ 50. Accordingly, we conclude that a person's returning his hands to his pockets after being asked to remove them by an officer is an important factor for a court to consider under the totality of the circumstances. We refuse, however, to adopt a per se rule that in all cases, regardless of other circumstances, a person's placing his or her hands in his or her pockets after an officer directed that the hands be removed is sufficient to provide reasonable suspicion to effectuate a protective weapons frisk. We consider the defendant's

[38] *See Richards v. Wisconsin,* 520 U.S. 385, 394–95 (1997) (overturning this court's blanket exception to the "knock and announce" requirement).

movement of his hands under the totality of the circumstances of the present case.

(3)

¶ 51. The State argues that the fluffiness of the defendant's coat was a factor contributing to reasonable suspicion in the present case. It argues that a bulky coat may conceal a weapon that an ordinary coat could not. In support of this proposition, the State cites numerous cases from other jurisdictions in which the size of a garment was a significant factor in supporting the reasonableness of a frisk.[39]

¶ 52. The defendant responds that wearing a "big, down, fluffy coat" in the middle of a Wisconsin winter is not suspicious or unusual behavior and notes that the temperature was low in Kenosha during the evening of December 23, 2001.

¶ 53. We agree with the defendant that wearing bulky winter clothing in the midst of a Wisconsin winter is not a suspicious activity in itself. But factors consistent with innocent behavior, like wearing a bulky winter coat on a cold winter night, might, under particular facts and circumstances with reasonable inferences, give rise to the requisite reasonable suspicion required for a frisk.[40] We therefore consider the fluffy coat in the context of the totality of the circumstances, especially in the context of the defendant's placing his hands in the pockets of his coat after being directed to remove them.

---

[39] *See* Brief of Plaintiff-Appellant-Petitioner at 29–30.

[40] *State v. Jackson,* 147 Wis. 2d 824, 835, 434 N.W.2d 386 (1989) (if reasonable suspicion can be drawn from the circumstances notwithstanding the existence of other inferences, the stop was proper).

¶ 54. Overt nervousness is a fourth factor that the State argues is a legitimate factor to consider in determining whether a protective search for weapons was reasonable.[41] We agree with the State and the defendant that our cases hold that unusual nervousness is a legitimate factor to consider in evaluating the totality of the circumstances.[42]

¶ 55. The officer testified that when the defendant stepped out of the car he "appeared a little nervous" and "was looking around." The officer further testified that he conducted the pat-down "cause he [the defendant] was acting kind of nervous, suspicious, and I was looking for the possibility that he may have weapons on him." In response to a question from the circuit court, the officer testified that the defendant was taking his hands in and out of his pockets "like a nervous habit." The officer also testified that the defendant appeared only "a little nervous," not unusually nervous, and also testified that nervousness is common during traffic stops.

¶ 56. The State contends that the defendant's nervousness should be considered unusual in the present case because as a passenger in a stopped vehicle, the defendant would not be ticketed and therefore had no reason to be nervous. The defendant responds that police encounters are inherently stressful for all persons, including passengers in an automobile,

---

[41] *See McGill,* 234 Wis. 2d 560, ¶ 29; *Morgan,* 197 Wis. 2d at 213, 215.

[42] *McGill,* 234 Wis. 2d 560, ¶ 29; *Morgan,* 197 Wis. 2d at 215.

and that as an African-American the defendant was likely to be fearful in a traffic stop situation.[43]

¶ 57. The circuit court did not make a finding on whether the defendant's nervousness exceeded the nervousness that is commonly exhibited by a passenger in a vehicle stopped by law enforcement. The defendant's nervousness is, according to the State, tied to the defendant's inserting and removing his hands from his coat pockets. We agree with this approach and shall consider the defendant's nervousness in connection with the movement of his hands.

(5)

¶ 58. The State, the defendant, and the court agree that the time at which a frisk occurs is a factor to be considered in the totality of the circumstances. Various cases have held that darkness, visibility, isolation of the scene, and the number of people in an area may all contribute to the determination of reasonable suspicion.[44] The hour of the day may also be relevant in that the individual's activities may or may not be consistent with the typical behavior of law-abiding citizens at that time.

¶ 59. The defendant argues that the facts of this case are distinguishable from various other cases in

---

[43] The defendant cites David Harris, *The Stories, the Statistics, and the Law: Why "Driving While Black" Matters*, 84 Minn. L. Rev. 265 (1999), in support of his position.

[44] *See, e.g., State v. Kelsey C.R.*, 2001 WI 54, ¶ 49, 243 Wis. 2d 422, 626 N.W.2d 777 (stop occurred in darkness with few people around); *McGill*, 234 Wis. 2d 560, ¶ 33 (police officer alone at night in dark driveway); *Morgan*, 197 Wis. 2d at 213–14 (stop occurred at 4 a.m. and traffic was light); *State v. Williamson*, 113 Wis. 2d 389, 392, 335 N.W.2d 814 (1983) (stop occurred at 2 a.m. and visibility was poor).

which the time of the frisk was relied upon as part of the totality of the circumstances. Notably, he argues that the vehicle in which he was riding was pulled over on a busy city street, which one of the officers testified was "kind of dark" but near a well-lighted intersection.

¶ 60. At oral argument the State argued that in this particular case the time of the stop and relative darkness of the scene were not particularly significant circumstances in determining reasonable suspicion. The two crucial and determinative facts in this case are, according to the State, the defendant's inserting his hands into and removing his hands from the pockets of his coat and the defendant's wearing a large, fluffy coat. The State argued that these two factors occurring in midday would be enough to justify reasonable suspicion.

¶ 61. Nevertheless, we consider the time of evening here (8:45 p.m., but dark) and the place of the stop (on a busy city street that was somewhat dark) in the totality of the circumstances.

(6)

¶ 62. Whether the geographical area in which a frisk occurs is perceived as a "high-crime" area can be one of the factors considered in justifying a frisk. Our cases have so held.[45] In response to a question about criminal activity in the area, the officer testified that the area in which he pulled over the vehicle was "pretty active."

¶ 63. The defendant responds that the phrase "pretty active" is meaningless because it is "pretty

---

[45] *See Morgan,* 197 Wis. 2d at 211 ("an officer's perception of an area as 'high-crime' can be a factor justifying a search"); *State v. Allen,* 226 Wis. 2d 66, 77, 593 N.W.2d 504 (Ct. App. 1999) (high crime reputation of the area).

ambiguous."[46] He argues that neither the officer nor the circuit court drew any inference from the officer's testimony regarding the level of crime in the area and that we should decline to do so as well.

¶ 64. We need not address the question whether the phrase "pretty active" is equivalent to the phrase "high crime area" or whether a law enforcement officer or court, without more, may infer the presence of danger to an officer from the officer's characterization of the area as a "pretty active" crime area.[47]

¶ 65. At oral argument the State argued that the crime rate of the area, like the time of the stop, was not a significant factor to be considered among the totality of the circumstances in the present case.

¶ 66. The State argues that had the protective weapon search occurred in a "good area," that is, an area that does not have a high or pretty active crime rate, and in broad daylight, the other two factors (the hands in the pocket and the size of the coat) would have been enough to justify reasonable suspicion. In other words, the State urges us to concentrate only on what it considers to be the two triggering factors.

¶ 67. Nevertheless, we decline the State's invitation to focus solely on what it considers to be the two triggering factors. We consider the officer's characterization of the location of the stop as a "pretty active"

---

[46] Brief of Defendant-Respondent at 18.

[47] *See* Margaret Raymond, *Down on the Corner, Out in the Street: Considering the Character of the Neighborhood in Evaluating Reasonable Suspicion*, 60 Ohio St. L.J. 99, 143 (1999) (arguing that the character of a neighborhood "should be considered only where the behavior that is relied upon to establish reasonable suspicion is behavior not commonly observed among law-abiding persons at the time and place observed.").

crime area, along with all the other factors, as part of the totality of the circumstances.

## IV

¶ 68. We have examined each of the six factors separately. We now examine them in their totality.

¶ 69. The stop occurred at approximately 8:45 p.m., an hour in which it is common for people to be traveling. The vehicle was stopped on a city street for a traffic violation, not a crime. The officer described the area as a "pretty active" crime area. The person who was subject of the search was a passenger in the vehicle. It was a cold December evening, and the defendant was wearing a large, fluffy coat that could be used to hide a weapon.

¶ 70. The defendant left the vehicle at the officer's direction. When the defendant got out of the vehicle he put his hands in his coat pockets. As the defendant walked to the back of the vehicle at the officer's direction, the officer asked him to keep his hands out of his pockets. The defendant immediately complied with the officer's request. In what the officer described as a "nervous habit," the defendant again inserted his hands into his pockets. Again the officer directed the defendant to remove his hands from his pockets, and again the defendant promptly complied with the officer's request. Thus, over a four-to-eight-second interval, the defendant apparently complied with the officer's request to take his hands out of his coat pockets and did keep his hands out of his pockets.

¶ 71. The officer did not describe the defendant's hand gestures as threatening or menacing; they were described as "a nervous habit." The officer testified that he didn't feel any particular threat when he frisked the

defendant for weapons. The officer further testified that he "told [the defendant] to take his hands out of his pockets . . . and [the defendant] cooperated." Nevertheless, the officer conducted a frisk for weapons.

¶ 72. We are not persuaded that the two key factors emphasized by the State, the size of the overcoat and the defendant's placement of his hands in his pockets, even when considered in light of the totality of the circumstances, were sufficient to create reasonable suspicion in the mind of a reasonable law enforcement officer that the defendant was armed and dangerous. We conclude that the officer could not, as a matter of law, have reasonably suspected that the defendant was armed and dangerous. The officer's belief under the circumstances of this case that the defendant was armed and dangerous was more "an inchoate and unparticularized suspicion or 'hunch' "[48] than a reasonable inference. There was not sufficient articulable, objective information to provide the officer with reasonable suspicion that the defendant was armed and dangerous to the officer or others. Accordingly, we affirm the decision of the court of appeals, affirming the order of the circuit court suppressing the evidence.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 73. PATIENCE D. ROGGENSACK, J., did not participate.

¶ 74. JON P. WILCOX, J. (*dissenting*). I join the majority opinion insomuch as it holds that an officer's subjective belief that his or her safety or the safety of others is in danger is not a prerequisite to a valid

---

[48] *Terry,* 392 U.S. at 27.

protective search under *Terry v. Ohio,* 392 U.S. 1 (1968). Majority op., ¶ 30. I also agree with the majority that "[b]ecause an objective standard is applied to test for reasonable suspicion, a frisk can be valid when an officer does not actually feel threatened by the person frisked or when the record is silent [regarding the officer's actual belief]." Majority op., ¶ 23. I also agree with the majority that there should not be a per se rule justifying a search anytime an individual places his hands in his pockets contrary to police orders. Majority op., ¶ 48.

¶ 75. However, I agree with Justice Crooks' dissent and would hold that under the totality of the circumstances present in this case there were sufficient articulable, objective facts to provide the arresting officer with a reasonable suspicion that the defendant may have been armed. *See State v. McGill,* 2000 WI 38, ¶ 33, 234 Wis. 2d 560, 609 N.W.2d 795; *State v. Morgan,* 197 Wis. 2d 200, 209, 539 N.W.2d 887 (1995).

¶ 76. The pertinent inquiry in a *Terry* analysis is whether under the totality of the facts present, the officer could reasonably suspect that the individual with whom he is dealing is armed. *Morgan,* 197 Wis. 2d at 209. As the Court in *Terry* stated: "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief that the action taken was appropriate?" *Terry,* 392 U.S. at 21–22. As noted by the majority, if objectively, a reasonable person would suspect that a person is armed, the individual officer's subjective belief is inconsequential. Majority op., ¶ 23. An officer need not be absolutely certain that the individual is armed. *Terry,* 392 U.S. at 27. A reasonable belief is not even required; all that is required is that

34

the officer has a reasonable suspicion that the individual is armed. *Morgan,* 197 Wis. 2d at 209.

¶ 77. Utilizing the above standards I would hold that the search of the defendant was justified under the totality of the circumstances present at the time the defendant was frisked. In evaluating the reasonableness of the search, the court must "look to the totality of the circumstances known to Officer [Rivera] in determining whether an officer in his position would reasonably suspect that [Kyles] might be armed." *Morgan,* 197 Wis. 2d at 209–10. This court in *Morgan,* 197 Wis. 2d at 211–12, held that the fact that a search is conducted in a "high crime" area is one factor to be considered in evaluating the legitimacy of a search. In *Morgan,* we found the search to be reasonable where the officer characterized the area as " 'a fairly high-crime-rate area.' " *Id.* at 212–13. Further, in *State v. Allen,* 226 Wis. 2d 66, 77, 593 N.W.2d 504 (Ct. App. 1999), the court noted that the high-crime reputation of the area where the search was conducted constituted a factor contributing to the legitimacy of the search. Here, the officer described the area as "pretty active" in terms of criminal activity. Thus, the location where the stop occurred here is a factor supporting the reasonableness of the search.

¶ 78. This court has also recognized that the time of day when the stop occurs is a relevant factor to consider. In *McGill,* 234 Wis. 2d 560, ¶ 20, we noted that an increasing number of assaults on police officers occur between the hours of 6:00 p.m. and 4:00 a.m. *See also, Morgan,* 197 Wis. 2d at 211 *(accord).* In *McGill,* 234 Wis. 2d 560, ¶ 32, this court stated that "[w]e have consistently upheld protective frisks that occur in the evening hours . . . ." Here, the vehicle in which the defendant was a passenger was pulled over at approxi-

mately 8:45 p.m. on December 23. Therefore, the time of day when the defendant was frisked is a factor supporting the reasonableness of the search. Further, in *McGill,* 234 Wis. 2d 560, ¶ 32, we recognized that "at night, an officer's visibility is reduced by darkness and there are fewer people on the street to observe the encounter." Here, while there was testimony that the intersection where the stop occurred was well lit in one of the corners, the area where the stop occurred was a dark area. Given the time of night, this is an additional factor that supports the legitimacy of the search.

¶ 79. Moreover, this court has recognized that overt nervousness is a factor to be considered in evaluating the reasonableness of a search. *Id.,* ¶ 29; *Morgan,* 197 Wis. 2d at 214. While the arresting officer testified that the defendant was nervous, he stated that the defendant was not unusually nervous. However, the majority agrees with the State that the defendant's nervousness needs to be evaluated in light of the defendant's actions in repeatedly placing his hands in his pockets. Majority op., ¶ 57. Further, the majority aptly notes that " 'an otherwise inexplicable sudden movement toward a pocket or other place where a weapon could be concealed [or] an otherwise inexplicable failure to remove a hand from a pocket[]' " is a factor that often justifies a frisk. Majority op., ¶ 42 n.33 (quoting 4 *Wayne R. LaFave, Search and Seizure* § 9.5(a) (3d. ed. 1996)). In *McGill,* 234 Wis. 2d 560, ¶ 37, this court explained that "during the course of the frisk, McGill kept reaching for his pockets, despite being told by the officer not to. . . . [This fact,] combined with his twitchy hand movements and his general nervousness, reinforced the officer's reasonable belief that the defendant was concealing something, perhaps a weapon, in that pocket." We stated that McGill's

36

twitchy hand movements and nervous behavior "in particular justified the officer's suspicions about the presence of a weapon and supports the reasonableness of the frisk." *Id.,* ¶ 31.

¶ 80. The majority notes that the defendant repeatedly placed his hands inside his pockets in a "nervous habit," as he walked towards the back of the vehicle, even after the officer directed the defendant to remove his hands from his pockets. Majority op., ¶ 70. The majority recognizes the need of law enforcement officials to see the hands of individuals with whom they are dealing and notes that this concern is heightened when individuals refuse to comply with an officer's request to remove their hands from their pockets. Majority op., ¶ 41. Given that the defendant here repeatedly placed his hands in his pockets in a nervous fashion during a four to eight second interval—more than enough time to brandish and fire a handgun—this factor weighs heavily in favor of the legitimacy of the search.

¶ 81. Finally, when asked about whether he could see a bulge in the defendant's coat, the officer stated that the coat was "so fluffy you couldn't see the bulge." The State argues and the majority agrees that the fact the defendant was wearing a large fluffy coat is a factor to be considered as part of the totality of the circumstances present. Majority op., ¶ 53. The fact that the defendant was wearing a coat large enough to conceal a weapon without exhibiting a visible protrusion supports the reasonableness of the search.

¶ 82. While each factor the majority identifies may not, by itself, be sufficient to justify the search, each factor weighs in favor of finding that the search was reasonable. Here, the officer confronted two individuals in a pretty active crime area at night in a

relatively dark portion of an intersection. The defendant was wearing a coat that was large enough to conceal a weapon without any visible protrusion. The defendant was walking to the rear of the vehicle and disregarded the officer's directions by repeatedly placing his hands inside his pockets in a nervous fashion over a four-to-eight-second interval. I believe that "[a] reasonably prudent officer in possession of these facts would be warranted in the belief that his suspect may be armed and presently dangerous." *McGill,* 234 Wis. 2d 560, ¶ 33.

¶ 83. The only factor weighing against the legitimacy of this search is that the officer did not consider the defendant to be "menacing." Majority op., ¶ 71. However, as the majority discusses at length, this factor is not dispositive. Majority op., ¶ 39. The majority states that "[w]e are not persuaded that the two key factors emphasized by the State, the size of the overcoat and the defendant's placement of his hands in his pockets . . . were sufficient to create [a] reasonable suspicion . . . that the defendant was armed and dangerous." Majority op., ¶ 72. However, regardless of what factors the State "emphasized," I believe that under the totality of the circumstances, the following factors taken together validate the search: 1) the late hour of the day; 2) the relative darkness of the area where the search occurred; 3) the amount of criminal activity in the area; 4) the defendant's nervousness; 5) the defendant's persistent disobedience of police orders by placing his hands in his pockets as he approached the rear of the vehicle; and 6) the fact that the defendant's coat was large enough to conceal a weapon without any visible indication of such.

¶ 84. The fact that the search here was justified is apparent because this court in *Morgan,* 197 Wis. 2d at 215, upheld a search under more benign conditions:

> In *Morgan,* two officers on patrol at 4 a.m. in what was described as a "fairly high-crime area" observed a car driving in and out of an alley. The car had expired license plates, and the officers pulled it over. The driver was unable to produce his license and appeared nervous. We upheld the officers' decision to frisk the driver based upon the totality of those facts.

*McGill,* 234 Wis. 2d 560, ¶ 25. Applying the objective *Terry* analysis, I would hold that there were sufficient facts to provide the arresting officer with a reasonable suspicion that the defendant may have been armed. *McGill,* 234 Wis. 2d 560, ¶ 33. Under the totality of circumstances present here, an individual in Officer Rivera's position would reasonably suspect that Kyles might have been armed. *Morgan,* 197 Wis. 2d at 209–10.

¶ 85. For the reasons discussed, I dissent.

¶ 86. I am authorized to state that Justice N. PATRICK CROOKS joins this dissenting opinion.

¶ 87. N. PATRICK CROOKS, J. (*dissenting*). I disagree with the majority that the facts of this case do not satisfy the totality of the circumstances test as outlined by the United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1 (1968), and by this court in *State v. McGill,* 2000 WI 38, ¶ 22, 234 Wis. 2d 560, 609 N.W.2d 795. In order to satisfy this test, a police officer is required to show that he or she had reasonable suspicion about a threat of physical harm by the defendant, based on "specific and articulable facts . . . ." *Terry,* 392 U.S. at 21; *McGill,* 234 Wis. 2d 560, ¶ 22. Those facts should be considered, along with rational inferences

drawn from such facts, in determining the reasonableness of a protective frisk by an officer.

¶ 88. The State has pointed to multiple specific facts about the search of the defendant, which made it reasonable for the officer in this case to be suspicious and protective of his own and the public's safety. These facts, and the rational inferences drawn from them, clearly show the reasonableness of the protective frisk conducted here. The testifying officers noted the late time of day, the high degree of darkness, the "fair" amount of crime in the area, the apprehensive behavior of the defendant, the fact that the defendant's coat was oversized and puffy, and the defendant's repeated disregard of officers' instructions not to put his hands into his coat pockets.

¶ 89. Several of those facts have been found by this court in the recent past to be significant to a determination that the totality of circumstances weighed in favor of the officer conducting a protective frisk or a search. The majority reiterates those factors here, yet fails to give them sufficient weight. Although the State has relied heavily on the fact that the defendant concealed his hands in his pockets, after being told not to do so, perhaps to the detrimental exclusion of the other factors, this court should not ignore the significance of the cumulative effect of all of the specific facts presented by this case. In dismissing the numerous specific facts in this case, the majority ignores the reasonableness of the protective frisk conducted in this case.

¶ 90. I also disagree with the majority's treatment of the court of appeals' language regarding an officer's "subjective fear" in *State v. Mohr*, 2000 WI App. 111, 235 Wis. 2d 220, 613 N.W.2d 186. The majority opinion disavows an interpretation of *Mohr* that requires an

officer's subjective fear in order for a protective frisk or a search to be reasonable. Nevertheless, the majority agrees with defendant's counsel that the officer's subjective fear is one factor that a circuit court may consider in evaluating the totality of the circumstances. Majority op., ¶ 24, footnote 16. Thus, the majority clearly approves of giving this factor sufficient weight in evaluating the reasonableness of a protective frisk.

¶ 91. I cannot agree with the majority that the subjective fear of the searching officer should be a factor, among others, in the totality of the circumstances test. To the extent that *Mohr* contains language that mixes objective factors with the subjective factors of an officer's fear, impressions, or motives, I would withdraw that language. The standard used to examine an officer's reasonable basis for conducting a protective frisk or a search should be the objective, "specific and articulable facts" required by the United States Supreme Court in *Terry*.

¶ 92. The United States Supreme Court has disfavored the use of subjective officer intentions or feelings when determining the constitutionality of law enforcement actions. *Whren v. United States*, 517 U.S. 806 (1996). In *Whren*, the Court held that in the context of traffic stops the subjective motives of an officer do not make illegal conduct that otherwise satisfies the Fourth Amendment: "We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813. The majority feels that *Whren* and its progeny, *United States v. Knights*, 534 U.S. 112 (2001), are not in conflict with *Mohr*, because they do not use subjective officer feelings as a factor within the

totality of the circumstances. Although the United States Supreme Court does not discuss that particular use and its implications, I fail to see how use of the subjective factors may be disfavored at a macro level of constitutional analysis, yet may be accepted at a micro level. When the Court specifies that "subjective intentions play no role" in "Fourth Amendment analysis," it certainly is logical to interpret "analysis" as encompassing the totality of the circumstances test itself.

¶ 93. I believe the majority misses the opportunity to place the recent Wisconsin cases of *McGill*, *Mohr*, and this case along some understandable continuum of facts involving a totality of the circumstances analysis. The majority opinion fosters the continued potential for confusion in this area with regard to just how much weight, if any, the subjective impressions of an officer should be given. I would reverse the judgment of the court of appeals in this case. Here, the circuit court clearly felt obligated to place reliance on *Mohr*'s subjective impression language. Language that was, in my opinion, incorrect. The specific and articulable facts, along with the rational inferences properly drawn from those facts, clearly demonstrate the reasonableness of the protective frisk conducted here, and the subsequent seizure of contraband.

¶ 94. For the reasons stated, I respectfully dissent.

¶ 95. I am authorized to state that Justice JON P. WILCOX joins this dissenting opinion.