**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**November 27, 2019**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2019AP492-CR**

**STATE OF WISCONSIN**

Cir. Ct. No.  2015CF294

**IN COURT OF APPEALS**
**DISTRICT IV**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

MICHAEL B. KINGSLEY,

   DEFENDANT-APPELLANT.

        APPEAL from a judgment of the circuit court for Monroe County: TODD L. ZIEGLER, Judge.  *Affirmed*.

        Before Blanchard, Kloppenburg and Graham, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM. Michael Kingsley appeals a judgment of conviction for possession of THC and misdemeanor bail jumping. Kingsley challenges the circuit court's denial of a motion to suppress. He argues that the police lacked reasonable suspicion to conduct a protective search of his vehicle during the course of a traffic stop. We conclude that there was reasonable suspicion for the search. Accordingly, we affirm.

¶2      When we review a suppression issue, we uphold the circuit court's factual findings unless they are clearly erroneous. *See **State v. Johnson***, 2007 WI 32, ¶13, 299 Wis. 2d 675, 729 N.W.2d 182. We review de novo whether the facts satisfy the constitutional standard for reasonable suspicion. *See **id**.*

¶3      Courts "'decide on a case-by-case basis, evaluating the totality of the circumstances, whether an officer had reasonable suspicion to effectuate a protective search for weapons in a particular case.'" ***Id.***, ¶22 (quoted source omitted). In the context of a traffic stop, "such a search [of the vehicle] is justified when an officer reasonably suspects that the person 'is dangerous and ... may gain immediate control of weapons' placed or hidden in the passenger compartment." ***Id.***, ¶24 (quoted source omitted). Reasonable suspicion is a commonsense, nontechnical test. ***State v. Eason***, 2001 WI 98, ¶19, 245 Wis. 2d 206, 629 N.W.2d 625. It is a less demanding standard than probable cause. *See **id**.* "In other words, the required showing for reasonable suspicion is low." ***Id***

¶4      Here, the facts come from the testimony of the City of Tomah police officer who conducted the protective search of Kingsley's vehicle. The officer was the sole witness at the suppression hearing, and the circuit court credited his testimony.

¶5    On the night of the stop, the officer was on duty when he noticed Kingsley operating a vehicle and then coming to a stop in front of a residence. The officer knew Kingsley from prior contacts and believed that Kingsley lacked a valid driver's license.  The officer pulled into an alley, contacted dispatch, and confirmed that Kingsley's license was suspended.

¶6    As Kingsley's car pulled away and passed him, the officer observed that Kingsley was in the passenger seat with someone else driving.  The officer saw Kingsley "slouch[] back in his seat" in an obvious effort to obscure his face from view.  The officer followed Kingsley's car and activated his squad lights.

¶7    As the driver of the vehicle began to pull over, the officer observed both Kingsley and the driver "lean toward the center console as if they were trying to conceal an item or obtain something from underneath the seats near the center console area."  The officer became concerned because of Kingsley's "history," which included a criminal history involving drugs.  In the officer's experience, sometimes weapons were found in drug investigations, and sometimes they were not, depending on the circumstances.

¶8    The officer was also concerned because of Kingsley's association with the Sovereign Citizen Movement.  The officer had received training and education on this movement, and he previously had "a couple" of interactions with other individuals who shared the movement's ideology.  His understanding of the ideology was as follows:  "[T]he general premise is that they don't recognize a centralized government.  They don't recognize law enforcement.  A very general view."  Based on the officer's experience and prior interactions, he believed it was "[c]ommon" for individuals in the movement to be associated with weapons possession.

¶9    During his testimony, the officer referred to the "dangers" of individuals or views associated with the movement. He went on to state that police contacts with Kingsley have resulted in a department-wide response based on "[o]fficer safety concerns":

> A ... [T]he law enforcement community has recognized the dangers that these people who share these views hold…. And particularly with this case, whenever Mr. Kingsley's name is broadcasted over the radio, all of our police officers respond to assist. Whether they were actually involved or just in the general area, they always respond to assist.
>
> Q  Why is that?
>
> A  Officer safety concerns.

¶10    The officer acknowledged that, in his prior contacts with Kingsley, he had never found Kingsley with a weapon. The officer could not remember precisely how many such contacts there were, but they were "numerous," "[m]ore than five."

¶11    When the officer approached Kingsley's car, he recognized the driver as Jason Lobe. The officer knew Lobe from numerous prior contacts as well, and knew him to be a heroin user.

¶12    The officer observed that both Kingsley and Lobe were visibly nervous, fidgety, and shaking. "[W]hat stood out" to the officer was that Kingsley had "never appeared as visibly nervous as he was that day."

¶13    The officer requested backup for officer safety. When backup arrived, the officer had Kingsley and Lobe exit Kingsley's car, and he conducted a protective search of the vehicle. The search led to the discovery of drug evidence.

¶14    Kingsley contends that the totality of the circumstances do not rise to the level of reasonable suspicion for a protective search of his car. We disagree. We discuss below the circumstances that we view as most significant.

¶15    First, the officer saw both Kingsley and Lobe "lean toward the center console as if they were trying to conceal an item or obtain something from underneath the seats near the center console area." While this type of movement may not be sufficient by itself to justify a protective search, it is a significant factor in the totality of the circumstances. *See **Johnson***, 299 Wis. 2d 675, ¶37 (surreptitious movement can be "a substantial factor in establishing that officers had reason to believe that the suspect was dangerous and had access to weapons"). Adding to Kingsley's suspicious movements, the officer saw him make an obvious attempt to obscure his face from view.

¶16    Second, the officer testified that "what stood out" to the officer was that Kingsley had "never appeared as visibly nervous as he was that day." Kingsley tries to minimize the significance of this factor by questioning whether police can reliably assess nervousness levels and whether nervousness is a valid indicator of weapons possession. However, case law establishes that police assessments of nervousness are a proper consideration when addressing reasonable suspicion for a protective search. *See, e.g.*, ***State v. Kyles***, 2004 WI 15, ¶54, 269 Wis. 2d 1, 675 N.W.2d 449; ***State v. McGill***, 2000 WI 38, ¶29, 234 Wis. 2d 560, 609 N.W.2d 795. We are bound by that case law. Further, the officer's assessment of Kingsley's unusual nervousness was especially significant given the officer's familiarity with Kingsley from numerous prior contacts.

¶17    Third, the officer knew that both Kingsley and Lobe had criminal drug histories, and the officer testified that drug investigations sometimes turn up

weapons. Kingsley contends that his criminal drug history is not significant because the case law establishes a link between weapons and drug *dealing*, not between weapons and drug activity more generally. However, Kingsley does not point to case law that would prevent us from considering the officer's testimony linking weapons and drug crimes generally as part of the totality of circumstances.

¶18 Fourth, the officer testified that Kingsley was associated with the Sovereign Citizen Movement and that, based on the officer's training and experience, it was "[c]ommon" for individuals in that movement to be associated with weapons possession. We find this testimony significant as an objective, articulable factor contributing to the reasonable possibility that Kingsley was in possession of a weapon. By contrast, we do *not* consider significant the officer's testimony about his general understanding of views held by Kingsley or other individuals associated with the movement,[1] such as the concept of not recognizing law enforcement.

¶19 Fifth, the officer was aware that police contacts with Kingsley prompted a department-wide response based on officer safety concerns. Although the officer's testimony did not explain whether those safety concerns were based on something more than Kingsley's association with the Sovereign Citizen Movement or general views that Kingsley might have held consistent with the movement's ideology as described by the officer, we conclude that one reasonable inference from the officer's testimony as a whole is that the safety concerns were

---

[1] The State cites materials purporting to describe the Sovereign Citizen Movement with greater specificity and characterizing the movement as a dangerous extremist group. That material was not before the circuit court at the suppression hearing, and we do not consider it.

based on something more.[2] As noted above, after the officer testified regarding his concerns with the movement, the officer went on to state, "*[a]nd particularly with this case*, whenever Mr. Kingsley's name is broadcasted over the radio, all of our police officers respond to assist." (Emphasis added.)

¶20 Finally, the officer expressed subjective concern for his safety. Although not dispositive, an officer's subjective safety concern is a relevant factor that can contribute to reasonable suspicion for a protective search. *See State v. Buchanan*, 2011 WI 49, ¶15, 334 Wis. 2d 379, 799 N.W.2d 775; *Kyles*, 269 Wis. 2d 1, ¶¶37, 39.

¶21 Kingsley argues that a protective search was not reasonable because the officer never found a weapon on Kingsley or Lobe during the officer's numerous prior contacts with both men. This is a significant factor that weighs in Kingsley's favor. However, when we consider it in combination with the other factors, we conclude that it does not tip the balance against reasonable suspicion for the protective search. As already discussed, the officer's prior contacts with Kingsley *support* the reasonableness of the search insofar as the officer's assessment of Kingsley's unusual nervousness was especially significant given the officer's familiarity with Kingsley.

¶22 In sum, we conclude that there was reasonable suspicion for the protective search.

---

[2] The officer testified that Kingsley provided the police department with "documentation" in line with the Sovereign Citizen Movement's ideologies, but the officer did not state that this documentation contained anything threatening or weapons-related.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2017-18).