STATE of Wisconsin,
Plaintiff-Respondent,

v.

Deandre A. BUCHANAN,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 09AP2934–CR. Oral argument April 19, 2011.*
*—Decided June 29, 2011.*

2011 WI 49

(Also reported in 799 N.W.2d 775.)

For the defendant-appellant-petitioner there were briefs by *Tyler William Wickman* and *Dallenbach & Anich, S.C.* and oral argument by *Tyler William Wickman.*

For the plaintiff-respondent there was a brief by *Thomas J. Balistreri,* assistant attorney general with whom on the brief was *J.B. Van Hollen,* attorney general, and oral argument by *Thomas J. Balistreri.*

¶ 1. N. PATRICK CROOKS, J. This is a review of an unpublished court of appeals opinion[1] that affirmed Deandre Buchanan's conviction for possessing marijuana with intent to deliver. The question we address in this case is whether the evidence Buchanan unsuccessfully sought to suppress was seized in violation of the federal and state constitutional provisions barring unreasonable search and seizure. The threshold question is whether the initial protective search of Buchanan and his vehicle was valid; if it was valid, we must also address whether the piece of marijuana plant that the Wisconsin State Trooper discovered on the car floor during the protective search was in plain view and

---

[1] *State v. Buchanan,* 2009AP2934–CR, unpublished slip op. (Wis. Ct. App. Aug. 10, 2010).

whether there was probable cause to justify seizing it.[2] The United States Supreme Court has held that protective searches, or "frisks," must be based on a reasonable suspicion that the officer is in immediate danger because a suspect may have ready access to a weapon. In this case, the trooper who stopped Buchanan testified that he saw Buchanan make furtive movements that indicated that he may have been hiding something beneath the driver's seat, and that he noticed that Buchanan's hands were shaking as if he were very nervous. He testified that he learned facts from accessing a computer in his police car and contacting dispatch about Buchanan's arrest record, which included a recent drug delivery arrest and arrests for armed robbery, false imprisonment and murder. The trooper called for backup and, after the backup officer arrived, then frisked Buchanan and the area inside the car within the driver's reach.

¶ 2. The State and Buchanan disagree about whether under the totality of the circumstances, the observed conduct and arrest record on which the trooper relied constitute "specific and articulable facts which, taken together with the rational inferences from those facts"[3] create a reasonable suspicion that the person with whom he is dealing is armed and dangerous and a

---

[2] A field test of the plant stem was positive for the presence of THC. According to information in the record, the trooper subsequently asked Buchanan whether he had any additional marijuana, and Buchanan responded that he had "a bag" in his sock and "a couple of pounds" in the trunk. The marijuana was recovered from the trunk. That seizure is not directly before us; its validity turns on the validity of the prior searches.

We note that the validity of the initial protective searches of Buchanan and his vehicle does not depend on the doctrine of plain view.

[3] *Michigan v. Long*, 463 U.S. 1032, 1049 (1983).

383

protective search is justified for the officer's safety. Buchanan asks us to reverse the decision of the court of appeals on the grounds that the ruling contravenes the holdings in two of this court's cases—one that focused on a driver's furtive movements and another that focused on a suspect's arrest record—both of which held that the evidence in question was not enough to justify a protective search. In the circumstances present in those cases, *State v. Johnson* and *State v. Eason,* this court deemed the evidence insufficient to establish reasonable suspicion.[4] The State asks us to affirm, arguing that the discovery of the arrest information put the officer's observations into a different context and, in effect, altered the inferences he could rationally draw from those facts.

¶ 3.   We hold that under the totality of the circumstances in this case, the trooper's observation of Buchanan's furtive movements and visible nervousness, a record of arrests for violent crimes, and a drug delivery arrest that had occurred nearby a short time before the stop constitute "specific and articulable facts which, taken together with the rational inferences from those facts,"[5] create reasonable suspicion and justify a protective search for the officer's safety. The protective search

---

[4] *See State v. Johnson,* 2007 WI 32, ¶ 3, 299 Wis. 2d 675, 729 N.W.2d 182 (finding insufficient support for a protective search where the suspicion was based only on the fact that the officer saw the driver "make a strong furtive movement bending down as if he was reaching . . . underneath the seat") and *State v. Eason,* 2001 WI 98, 245 Wis. 2d 206, 629 N.W.2d 625 (finding insufficient support for reasonable suspicion for a no-knock entry where the only particularized evidence consisted of the suspects' arrest records and ultimately adopting a good-faith exception that rendered the evidence of the search admissible).

[5] *Long,* 463 U.S. at 1049.

was therefore justified. The subsequent discovery of contraband was made in the course of the search while the item was within plain view; because there was a basis for a protective search, the trooper had a right to be in a position to view it. The trooper's recognition of the smell and appearance of the marijuana, together with the other suspicious circumstances, provided probable cause to believe that it was contraband and that he could validly seize it. There is therefore no basis for suppressing the evidence that was obtained as a result of these actions. We consequently affirm the court of appeals.

## I. BACKGROUND

¶ 4.  A Wisconsin State Trooper was on duty on a stretch of Interstate 94 in Trempealeau County on the evening of March 4, 2009. At about 9:30 p.m., he saw Buchanan driving west on the interstate and exceeding the speed limit by about ten miles an hour. The trooper pulled out behind him and signaled for him to pull over. The trooper later testified at the suppression motion hearing that when he turned on the siren and lights, including a spotlight that illuminated the interior of Buchanan's car, the vehicle began weaving, and he saw "the driver was moving his shoulder and his arm up and down," and it looked "like he was stuffing something either underneath the seat or under his foot area." Buchanan then slowed and pulled to the side of the road.

¶ 5.  The trooper observed when he approached the vehicle and spoke to Buchanan that Buchanan's "hands were shaking" and he appeared "very nervous." The trooper returned to his police car, ran a check on Buchanan's driver's license, and requested that dispatch "run a criminal history on him." The trooper then received responses, via computer, to both his entry of the license number and his request to dispatch. The re-

sponses informed him "of a pending drug charge from a couple of weeks prior from District 6 of the State Patrol, Eau Claire, and dispatch advised [him] that [Buchanan] had multiple violent arrests in the past such as murder, armed robbery and false imprisonment." The trooper testified that the message he received via computer gave him sufficient information to know that "[Buchanan] had a recent delivery charge of marijuana on his criminal history in Wisconsin in that same area" and that the other charges "were from North Dakota and Minnesota." He had no information about the disposition of the charges.

¶ 6.  The trooper radioed for backup and waited a few minutes. When asked on direct examination what he planned to search when he returned to Buchanan's car, he stated, "Not planning on doing any searching of the vehicle, I was planning on doing a frisk of the vehicle to ensure there was no weapons in the vehicle." Within ten minutes of the initial stop, an officer arrived as backup, and the trooper returned to Buchanan's vehicle with the officer and asked Buchanan to get out of the car. He then frisked Buchanan; he described the frisk as "[a] short, cursory pat-down of the waist area, anywhere where weapons are commonly hidden." He found no weapon. He testified that, using a flashlight, he then "returned to [Buchanan's] vehicle and conducted a cursory frisk of the driver's lunge area[6] under

---

[6] There are two types of searches in which one encounters the concept of the "lunge area" or "grab area":  a protective search and a search incident to a lawful arrest. The objectives differ slightly, but the concept of a search limited in scope is common to both, and both focus on the area within the reach of the person being detained—the area within which he or she could "lunge." (Compare State v. Sykes, 2005 WI 48, ¶ 20, 279 Wis. 2d 742, 754, 695 N.W.2d 277 ("The scope of a search

the seat and center console area." He found no weapons, but he did see "a piece of green plant material" visible on the car floor and he "smell[ed] an odor of raw marijuana in the vehicle." A field test of the plant was positive for THC, the active ingredient in marijuana. The trooper informed Buchanan that he would be doing a further search of the vehicle at that point. Additional marijuana was discovered in the vehicle, and Buchanan was subsequently charged with possession with intent to deliver THC (tetrahydrocannabinols) contrary to Wis. Stat. § 961.41(1m)(h)(3) (2007–08).[7]

¶ 7.  Buchanan moved to suppress the marijuana seized in the search on the grounds that there was an insufficient basis for reasonable suspicion for a protective search and that the protective search was a violation of Buchanan's constitutional protections against unreasonable search and seizure. Buchanan specifically argued that the furtive movements, nervousness, and the arrest record were not sufficient to establish reasonable suspicion. The Trempealeau County Circuit Court, the Honorable John A. Damon presiding, denied Buchanan's motion. Buchanan entered a plea of no contest and was convicted. He appealed the circuit

incident to arrest is confined to 'the area from within which [the suspect] might gain possession of a weapon or destructible evidence[.]' We have understood this to mean the area immediately surrounding the arrestee.") *with State v. Guy,* 172 Wis. 2d 86, 94–95, 492 N.W.2d 311 (1992) ("The constant refrain in these [protective search] cases has been that the need for police to protect themselves can justify a limited frisk for weapons.") *and Johnson,* 2007 WI 32, ¶¶ 26, 37 n.13 ("The sole justification for the [protective] search is the protection of the police officers and others nearby.").

[7] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

court's denial of his motion to suppress pursuant to Wis. Stat. § 971.31(10).[8] The court of appeals affirmed on the grounds that the protective search was supported by reasonable suspicion that Buchanan was armed and dangerous; it cited Buchanan's furtive movements prior to the stop, the unusual nervousness Buchanan displayed, the pending drug delivery charge, and the arrests for murder, false imprisonment and armed robbery.[9] Buchanan petitioned this court for review, which we granted.

¶ 8.   This review presents questions of fact and law. Buchanan challenges the constitutionality of the trooper's protective search of him and of the area within reach of the driver's seat in his vehicle that led to the discovery of contraband. Such limited searches, often referred to as "frisks" are "measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *State v. Kyles,* 2004 WI 15, ¶ 1, 269 Wis. 2d 1, 675 N.W.2d 449 (citing *Terry v. Ohio,* 392 U.S. 1, 24 (1968)).

> Whether the facts satisfy the constitutional requirement for performing a protective search for weapons—that an officer must have reasonable suspicion that a person may be armed and dangerous to the officer or others—is a question of constitutional law for this court to decide. We are not bound by a circuit court's or

---

[8] Wis. Stat. § 971.31(10) states, "An order denying a motion to suppress evidence or a motion challenging the admissibility of a statement of a defendant may be reviewed upon appeal from a final judgment or order notwithstanding the fact that the judgment or order was entered upon a plea of guilty or no contest to the information or criminal complaint."

[9] *State v. Buchanan,* 2009AP2934-CR, unpublished slip op., ¶ 8 (Wis. Ct. App. Aug. 10, 2010).

court of appeals' decision on this question of law, but we benefit from the analyses of these courts.

*Id.,* ¶ 7. If the protective search was unconstitutional because there was not the requisite reasonable suspicion to support it, the evidence ultimately seized as a result of the search must be suppressed. "Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion." *Segura v. U.S.,* 468 U.S. 796, 804 (1984).

## II.  ANALYSIS

### A.  THE PROTECTIVE SEARCH

██

¶ 9.   The question before us is whether there was reasonable suspicion to support the trooper's decision to conduct a protective search of Buchanan and his car. Courts "decide on a case-by-case basis, evaluating the totality of the circumstances, whether an officer had reasonable suspicion to justify a protective search in a particular case." *Kyles,* 269 Wis. 2d 1, ¶ 5. We have made the following observation about the quantum of evidence necessary to establish reasonable suspicion:

> Although it is not possible to state precisely what the term reasonable suspicion means, it is a "commonsense nontechnical conception(s) that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " What is certain is that reasonable suspicion is "a less demanding standard than probable cause." The information necessary to establish reasonable suspicion can be less in both content and reliability than the information needed to establish probable cause. In other words, the required showing of reasonable suspicion is low, and depends upon the facts and circumstances of each case.

*Eason,* 245 Wis. 2d 206, ¶ 19 (citations omitted).

¶ 10. We begin by reviewing what occurred just before the trooper made the decision to conduct the protective search. While on traffic enforcement duty, the trooper had observed Buchanan's car traveling in excess of the posted speed limit. The trooper testified that when he pulled onto the road behind Buchanan's car and activated his vehicle's lights to initiate the stop, he observed that Buchanan had started moving his arm and shoulder as if he were placing something beneath his feet while driving, which appeared to be the reason that the car began weaving in the lane as it slowed to pull over. The car had not been weaving before. The trooper testifed that Buchanan had appeared "very nervous" after the stop and his hands were shaking noticeably. The trooper returned to his vehicle, and there he obtained additional information from two sources about Buchanan's prior police contacts. The trooper planned to return to Buchanan's vehicle to complete the traffic stop and issue Buchanan a speeding citation. In determining the constitutionality of the initial protective search, we consider the facts the trooper knew about the driver he would be approaching and whether those facts, together with rational inferences, support a reasonable suspicion that Buchanan was armed and a threat to the officer's safety.

¶ 11. First, the trooper had seen the driver make a movement that could reasonably be understood to indicate that the driver was putting an item out of sight beneath the driver's seat, and as the driver did so, the car had weaved in the lane before pulling off to the side of the road. In *Johnson,* this court considered whether there was reasonable suspicion to justify a protective search that occurred after the traffic stop was resolved.

*Johnson,* 299 Wis. 2d 675, ¶ 45. The basis offered for reasonable suspicion in that case was solely the observed "furtive movement" of the driver.[10] *Id.* at ¶¶ 7, 18. In that case, the officer had no further reason to initiate a protective search. As we stated in *Johnson,* "Depending upon the totality of the circumstances in a given case, a surreptitious movement by a suspect in a vehicle immediately after a traffic stop could be a substantial factor in establishing that officers had reason to believe that the suspect was dangerous and had access to weapons." *Id.* at ¶ 37. The question is thus whether the furtive movement by Buchanan is a substantial factor in establishing reasonable suspicion. Nothing in *Johnson* bars us from considering such a movement together with other factors.

¶ 12.    Second, the trooper had observed in his initial contact with Buchanan that Buchanan was visibly shaking and "very nervous." As we have previously noted, "[O]ur cases hold that unusual nervousness is a legitimate factor to consider in evaluating the totality of the circumstances." *Kyles,* 269 Wis. 2d 1, ¶ 54. "Nervousness during a routine traffic stop is typical, but unusual nervousness of a suspect may indicate wrongdoing." *State v. Sumner,* 2008 WI 94, ¶ 33, 312 Wis. 2d 292, 752 N.W.2d 783.

¶ 13.    The third piece of information the trooper had to consider at that point was the information he had obtained via computer concerning Buchanan's arrest record, which included arrests for drug delivery, murder,

---

[10] *Johnson,* 299 Wis. 2d 675, ¶ 34 ("[T]he State contends that Johnson's movement in the interior of the car was a sufficiently compelling factor to justify Stillman's protective search of Johnson's car. The State asserts that the court of appeals improperly concluded *this single factor, by itself,* was not enough to establish reasonable suspicion." (emphasis added)).

armed robbery and false imprisonment. As with the "furtive movement," it is clear that an arrest record by itself would not, without more, support reasonable suspicion, but here it is considered in addition to other factors. In *Eason,* we considered the weight to be given to arrest records. In that case, the question was whether the arrest records of two individuals sufficed as the "particular facts [that] must be shown to establish reasonable suspicion" to justify the issuance of a no-knock warrant. *Eason,* 245 Wis. 2d 206, ¶¶ 20–21. We noted that

> in the absence of any *other particularized evidence,* and some link between [the defendant's] arrests for obstruction and the possible destruction of evidence, this approach [combining the fact of three prior arrests for obstructing police with an officer's statements about the likelihood of destruction of evidence] is not sufficient to establish reasonable suspicion [to support a no-knock warrant].

*Id.,* ¶ 23. The totality of the circumstances presented here, in contrast, includes a combination of violent crimes (armed robbery, false imprisonment and murder charges) and a recent drug delivery arrest in a nearby county, as well as particularized evidence of Buchanan's conduct and demeanor observed by the trooper. In considering the evidence required to establish reasonable suspicion for a no-knock warrant,[11] we held in *Eason* that absent other particularized evidence, rea-

---

[11] We note that *Eason* (which recognized a good-faith exception to the exclusionary rule, allowing evidence in that case that would otherwise have been excluded due to a flawed warrant) concerned a no-knock warrant for a home, not a protective search of a driver and vehicle following a traffic stop. *Eason* therefore involved a situation in which there was the heightened protection that the United States Constitution affords a person's home, given that "physical entry of the home is the chief

sonable suspicion was not established by an arrest record; we did not hold that an arrest record is not relevant to a calculation of the totality of the circumstances. Where there was no "other particularized evidence," we held that without knowledge of the disposition, time and location of the arrests, "[t]he arrests . . . provide little guidance" in the reasonable suspicion determination. *Id.*, ¶ 22.

¶ 14. Other jurisdictions have explicitly included arrest records when considering whether in the totality of the circumstances there is reasonable suspicion for a belief that a person is a threat to law enforcement personnel or is concealing weapons. For example, it has been held that reasonable suspicion to justify a strip search by jail officials may arise from factors such as "the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record." *Kelly v. Foti*, 77 F.3d 819, 821 (5th Cir. 1996) (citations omitted). "[I]ndi-

---

evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972). The question presented in *Eason* was not about a warrant—the basis for the warrant itself was not in question—but about whether there was justification for the added intrusiveness of a no-knock entry. *See South Dakota v. Opperman*, 428 U.S. 364, 367 (1976) (noting that "[the] Court has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment. . . . [W]arrantless examinations of automobiles have been upheld *in circumstances in which a search of a home or office would not.*" (internal citations omitted)(emphasis added)). That is not to say that constitutional protections have no application to autos. The Supreme Court stated that a vehicle search was unreasonable where "police could not reasonably have believed either that [the arrested person] could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein . . . ." *Arizona v. Gant*, 129 S. Ct. 1710, 1719 (2009).

vidualized suspicion sufficient to warrant a strip search of the arrestee in [the eight circuits that have invalidated blanket strip search policies against nonviolent misdemeanants] is based on factors such as the nature of the offense, the arrestee's appearance and conduct, and any prior arrest record." *Amaechi v. West,* 87 F. Supp. 2d 556, 565 (E.D. Va. 2000), aff'd and remanded, 237 F.3d 356 (4th Cir. 2001) (citing to cases from the 2d, 4th, 5th, 6th, 7th, 8th, and 9th circuits).

██

¶ 15.   An additional fact known to the court concerns the trooper's manifestation of concern for his safety. The trooper testified that before returning to Buchanan's car, he called for backup. He waited until a backup officer arrived and only then returned to the car with the second officer. This provides evidence of his stated concern for his safety.[12] "[A] court may . . . consider a police officer's fear or belief that his or her safety or that of others [is] in danger as part of the totality of the circumstances" when determining the reasonableness of a frisk. *State v. Kyles,* 2004 WI 14, ¶ 34, 269 Wis. 2d 1, 675 N.W.2d 449.

¶ 16.   Buchanan argues that without additional information about the disposition of those criminal charges, it is unreasonable to suspect that he was armed and dangerous. The State counters that when the trooper received the arrest information, it provided ad-

---

[12] The trooper testified that his reason for being cautious was that in his experience, people who deal drugs are more likely to be armed and dangerous than those who possess drugs for personal use:   "A lot of people when they deal drugs they carry weapons with them, [there's] just personal use of different types of drugs, and then there's delivery charges of drugs, [Buchanan] had a recent delivery charge of marijuana on his criminal history in Wisconsin in that same area."

ditional context[13] for the two previous observations about the furtive movement and the nervousness, and when added up, the specific facts and the inferences fairly drawn from them did support reasonable suspicion. Stated differently, the State's position is that the additional particularized evidence is what distingush-ishes this case from *Eason*.

¶ 17.   As this court has noted:

> Our protective search or "frisk" jurisprudence has consistently emphasized that the totality of all circumstances present and known to the officer must be taken into account to assess the legality of the procedure. Naturally, some factors will be of greater import than others in the reasonable suspicion calculus in a particular case.

*Sumner,* 312 Wis. 2d 292, ¶ 23.

¶ 18.   In this case, the factors, considered together, create reasonable suspicion that the item Buchanan was seen putting under the seat or reaching to retrieve when pulled over could have been a weapon. The factors, considered together, create reasonable suspicion that the officer faced danger in returning to the car to face a

---

[13] Buchanan argues that "[t]he State's argument implies that anytime a person has a pending drug charge, law enforcement has reasonable suspicion the person may be armed and dangerous and thus subject to a frisk when otherwise legally stopped." Pet'r Reply Br. at 7. However, the State specifically disavowed such a position:   "The previous arrests had little weight in and of themselves in the absence of any information about the facts of the offenses or their disposition." Resp. Br. at 18. Rather, the State argues that what is significant here is the juxtaposition of the arrest record information with the previous conduct:   "The newly acquired information and the new significance of previously known information 'gave meaning to [Buchanan's] surreptitious attempt to place something beneath his seat.' " *Id.* at 20.

driver who was extremely nervous and who had been arrested for murder, delivery of drugs, armed robbery, and false imprisonment. The trooper was not required to ignore that information. As we have frequently noted, traffic stops are dangerous for law enforcement, and permitting a limited search is a reasonable way to balance the competing interests involved:

> "The constant refrain in these [protective search] cases has been that the need for police to protect themselves can justify a *limited frisk for weapons. See, e.g., Maryland v. Buie* (officers have an interest in self-protection which can justify a protective sweep); *Michigan v. Long* ("Our past cases indicate . . . that protection of police and others can justify *protective searches* when police have a reasonable belief that the suspect poses a danger . . . ."); *Pennsylvania v. Mimms* ("What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety."); *Adams v. Williams* ("The purpose of this *limited search* is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ").

*Guy,* 172 Wis. 2d at 94–95 (citations omitted)(emphasis added). *See also State v. Young,* 2006 WI 98, ¶ 21, 294 Wis. 2d 1, 717 N.W.2d 729 and *State v. Waldner,* 206 Wis. 2d 51, 60–61, 556 N.W.2d 681 (1996). As the United States Supreme Court stated,

> [W]e stress that a *Terry* investigation . . . involves a police investigation "at close range," when the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger . . . ." In such circumstances, we have not required that officers adopt alternate means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter.

*Long,* 463 U.S. at 1052 (citations omitted).

396

¶ 19. A holding that reasonable suspicion can be established under circumstances that include a furtive movement, unusual nervousness, and a troubling arrest record for violent crimes and drug trafficking is consistent with this court's precedent. It is significant under a totality of the circumstances analysis that all of these factors were included here.

¶ 20. The trooper who stopped Buchanan was at the point of returning to the vehicle to approach the driver as part of a continued traffic stop. There is no allegation that the traffic stop was prolonged beyond the time necessary to complete the investigation of the violation. *See Johnson,* 299 Wis. 2d 675, ¶ 45. Under the totality of the circumstances, it was reasonable for the trooper to suspect that Buchanan was armed and dangerous.

### B. THE TROOPER'S DISCOVERY OF CONTRABAND

¶ 21. As noted above, the trooper found no weapon on Buchanan or in the vehicle. However, he did observe and seize a piece of plant material he saw while doing the protective search. Buchanan argues that the piece of plant material was not in plain view and that the situation is "akin to having something under a car seat" in that "[n]othing needs to be moved, but it will not be seen without first entering the vehicle and leaning down." Pet'r Br. at 41. The State argues that the evidence was properly seized because it was in plain view during the trooper's protective search and was visible "as soon as he bent over and looked down." Resp. Br. at 25.

¶ 22. In *Guy,* we considered the seizure of a baggie of cocaine that was found in the course of a protective search or frisk of the defendant. We described the analysis as follows:

397

Having concluded that Officer Zarse constitutionally frisked the defendant, we now turn to the subsequent seizure of the cocaine. After feeling a soft bulge that felt like it could have been cocaine or marijuana, Officer Zarse put her hand into the defendant's pocket and pulled out the baggie containing cocaine. The scope of a *Terry* search must be limited to a pat-down "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Consequently, because what Zarse felt did not feel like a weapon, she exceeded the lawful scope of a *Terry* search when she reached into the defendant's pocket. However,

> [a]ssuming the object discovered in the pat-down does not feel like a weapon, this only means that a further search may not be justified under a *Terry* analysis. There remains the possibility that the feel of the object, together with other suspicious circumstances, will amount to probable cause that the object is contraband or some other items subject to seizure, *in which case there may be a further search based upon that probable cause.*

*Guy,* 172 Wis. 2d at 100 (emphasis added).

¶ 23.  "This court has frequently stated the rule that objects falling within the plain view of an officer who has a right to be in the position to have the view are subject to valid seizure and may be introduced in evidence." *State v. Bell,* 62 Wis. 2d 534, 540, 215 N.W.2d 535 (1974). In *Guy,* we proceeded with the analysis by setting forth the three conditions that must be met in order for the plain view doctrine to apply:

> (1) the evidence must be in plain view; (2) the officer must have a prior justification for being in the position from which she discovers the evidence in "plain view"; and (3) the evidence seized 'in itself or in itself with

facts known to the officer at the time of the seizure, [must provide] probable cause to believe there is a connection between the evidence and criminal activity.'

*Guy,* 172 Wis. 2d at 101–02 (quoting *State v. Washington,* 134 Wis. 2d 108, 121, 396 N.W.2d 156 (1986).

¶ 24.   In this case, the trooper testified that after he conducted "a short, cursory pat-down of the waist area, anywhere where weapons are commonly hidden," he "returned to the vehicle and conducted a cursory frisk of the driver's lunge area under the seat and center console area." At that point, he testified, "I found no weapons, but as soon as I looked down I observed a piece of green plant material right underneath the ashtray."

¶ 25.   In response to questions, the trooper clarified that by "underneath," he did not mean that the plant material was obscured from view and confirmed that "[t]here was no manipulation done of anything in the vehicle," and that he could see the plant material on the car floor just by "bending over and looking in there." When asked if the plant piece was "in plain view with the flashlight," he answered, "Yes." He also stated that he "could smell an odor of raw maijuana in the vehicle." He seized the piece of plant material and conducted a field test, which indicated the presence of THC.

■

¶ 26.   Applying the test set forth above, we first address whether the contraband was in plain view. The evidence is that it was. The trooper testified that "as soon as [he] looked down [he] observed" the plant stem. There was no contrary testimony, and Buchanan concedes that "[the trooper] did not need to move anything." Pet'r Br. at 41. We next address the question of whether the trooper had "a prior justification for being

in the position from which [he] discover[ed] the evidence." We have already resolved that question in the State's favor above. The final question is whether "facts known to the officer at the time of the seizure [provide] probable cause to believe there is a connection between the evidence and criminal activity." Buchanan argues, on this point, that "[a] green plant stem alone is insufficient to give an officer probable cause to believe that criminal wrongdoing existed to justify seizing the object." Pet'r Br. at 43. The State responds that the trooper had sufficient experience to identify the plant material as marijuana by its appearance and smell, and that identification provided probable cause for him to seize it. There is no evidence in the record that contradicts this. In *Guy,* we noted the relevance of the officer's prior drug interdiction experience: "Zarse had found drugs in over 100 searches. That experience would help an officer know how drugs are stored and recognize the feel of a baggie containing bindles." *Guy,* 172 Wis. 2d at 102. The trooper in this case similarly testified that he had been doing drug interdiction patrols since he became a police officer about five years earlier and had made "probably over a hundred drug arrests."

¶ 27.   The requirements for the application of the plain view doctrine are met on these facts. In this not uncommon set of circumstances, contraband was discovered in the course of a valid protective search, but under these circumstances, suppression is not required. As the United States Supreme Court stated in *Michigan v. Long,* "If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should . . . discover contraband other than weapons, he clearly cannot be required to ignore the contraband,

and the Fourth Amendment does not require its suppression in such circumstances." *Long,* 463 U.S. at 1050.

## III.  CONCLUSION

¶ 28.   We hold that under the totality of the circumstances in this case, the trooper's observation of Buchanan's furtive movements and visible nervousness, a record of arrests for violent crimes, and a drug delivery arrest that had occurred nearby a short time before the stop constitute "specific and articulable facts which, taken together with the rational inferences from those facts"[14] create reasonable suspicion and justify a protective search for the officer's safety. The protective search was therefore justified. The subsequent discovery of contraband was made in the course of the search while the item was within plain view; because there was a basis for a protective search, the trooper had a right to be in a position to view it. The trooper's recognition of the smell and appearance of the marijuana, together with the other suspicious circumstances, provided probable cause to believe that it was contraband and that he could validly seize it. There is therefore no basis for suppressing the evidence that was obtained as a result of these actions. We consequently affirm the court of appeals.

*By the Court.*—Affirmed.

---

[14] *Long,* 463 U.S. at 1049–50.