COURT OF APPEALS
DECISION
DATED AND FILED

**January 6, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2020AP1210-CR**                                    Cir. Ct. No.  2017CF84

STATE OF WISCONSIN                                    IN COURT OF APPEALS
                                                     DISTRICT IV

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

JONATHAN P. TUGGLE,

    DEFENDANT-APPELLANT.

            APPEAL from a judgment of the circuit court for Clark County: LYNDSEY BRUNETTE, Judge. *Affirmed*.

            Before Fitzpatrick, Graham, and Nashold, JJ.

            **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. Jonathan P. Tuggle appeals a judgment of conviction for offenses relating to the seizure of methamphetamine, paraphernalia, and methamphetamine manufacturing equipment from his residence.  The issue in this appeal is whether the warrant's authorization to search for some items for which the supporting affidavit does *not* show probable cause renders the entire warrant invalid, such that all the evidence seized in the search must be suppressed. We rely on the severability doctrine to conclude that the incriminating evidence seized in the search need not be suppressed because the warrant validly authorized law enforcement to enter Tuggle's residence to search for one item, and the incriminating evidence was found in plain view when officers executed the warrant.  Accordingly, we affirm.

## BACKGROUND

¶2     The following facts are undisputed for purposes of this appeal.  On June 2, 2017, J.S. contacted the Clark County Sheriff's Office to report that his trail camera had taken photographs of two people entering and leaving a shed on his property.  J.S. did not know who the people were, and he did not give them permission to enter the shed.  He also did not believe that anything was missing, although he was uncertain on this point.  J.S. sent the photographs to Deputy Sheriff Aaron Ruggles.

¶3     J.S.'s girlfriend posted one of the photographs on Facebook.  Y.A. saw the photograph and reported to Deputy Ruggles that she was "95% sure" that she had caught the same people on her property on June 23, 2017.  According to Y.A., she confronted these people as they were leaving her attached garage and walking toward her unattached garage.  Y.A. informed them that they were trespassing, and they gave her a "suspicious" excuse for being on her property.

2

Y.A. said that she and her husband did an inventory of their property and that nothing was missing.

¶4    On June 27, 2017, a confidential informant provided the sheriff with the license plate number of a woman who matched the description of one of the people in the Facebook picture. The sheriff's office ran a vehicle check and identified the woman as Elizabeth Marie Tuggle (Elizabeth). Deputy Ruggles went to the address listed for the vehicle and rang the doorbell. A man and a woman came to the door; based on observation, Deputy Ruggles determined that these were the two people in the trail camera photographs. Officers corroborated Elizabeth's and Tuggle's identities by comparing their driver's license photos and Facebook content to the trail camera photographs. Based on these sources, officers also confirmed that the Tuggles were married and living together at the residence that Deputy Ruggles had visited.

¶5    On June 28, 2017, a sheriff's detective applied for a search warrant for the Tuggle residence and for Tuggle's vehicles. The application sought the following items "used in the commission of, or [that] may constitute evidence of," burglary or criminal trespass to a dwelling: (1) human tissue and bodily fluids; (2) tools that may have been used in the commission of a crime; (3) stolen items, "proceeds of criminal activity[,] specifically[,] theft of removable property from a dwelling of another," and any other contraband; (4) notes, writings, and other information detailing criminal activity; (5) vehicles owned by Elizabeth or Tuggle and present at the residence; (6) any forms of identification; (7) cell phones, electronic storage devices "including the data therein," and GPS units; and (8) "a pair of black work gloves." Regarding the black work gloves, the detective's affidavit requesting the search warrant states:

> After reviewing the [trail] camera from the victim's property, the male subject in the image was wearing work gloves[1] while going through items. This was suspicious as it was at the end of [the] month of May where temperatures are normally well abo[ve] freezing and the temperature on the [trail] camera showed 66 degrees Fahrenheit.

The warrant application incorporates Deputy Ruggles' case activity reports, setting forth law enforcement's communications with J.S. and Y.A. and the investigation of the Tuggles.

¶6     The search warrant was issued, and officers executed it that same day. According to the criminal complaint, officers began by "clear[ing]" or sweeping Tuggle's residence. In clearing the master bedroom, an officer observed "corner cuts" (drug bags); methamphetamine pipes; a mirror with lines of white powder on it, "consistent with the substance being snorted"; and a glass jar containing white powder, indicative to the officer of methamphetamine manufactured by the "one pot" method. After seeing these items in plain view, an officer went to the basement and observed what he believed to be an active methamphetamine lab. At that point, the officers left the residence and contacted the Granton Fire Department and "meth lab response personnel" at the Department of Justice, Division of Criminal Investigation (DCI). DCI agents eventually seized numerous items used to manufacture and consume methamphetamine. In addition to the drug-related evidence, some items referred to in the search warrant were also seized: electronics (cell phones, storage devices, computers, and an ipod), two pairs of gloves, including black work gloves (one pair found in the garage and

---

[1] Although this part of the search warrant affidavit does not describe the detective viewing "black" work gloves in the photos, as noted above, another section of the affidavit authorizes a search for "black work gloves." Thus, a reasonable inference is that the photographs depicted "black" work gloves. The parties do not dispute that the work gloves were black.

the other in a vehicle), and a letter to Tuggle showing that his address was the same as the residence searched.

¶7    Tuggle was arrested and charged with seven drug-related counts and three counts of second-degree recklessly endangering safety (related to the children living in the residence). Tuggle moved to suppress all of the evidence seized, arguing that the warrant lacked probable cause and that the good-faith exception under *United States v. Leon*, 468 U.S. 897, 922-23 (1984), did not apply. *See State v. Eason*, 2001 WI 98, ¶¶29-37, 63, 245 Wis. 2d 206, 629 N.W.2d 625 (*Leon* good-faith exception permits the admission of evidence seized in execution of an invalid warrant). The State argued that there was probable cause or, alternatively, that the good-faith exception applied. The circuit court denied the motion on probable-cause grounds, without reaching the application of the good-faith exception.

¶8    Following the denial of his suppression motion, Tuggle pleaded guilty to three counts: second-degree recklessly endangering safety; possession of materials for manufacturing methamphetamine, as a repeater; and possession of methamphetamine manufacturing waste, as a repeater. *See* WIS. STAT. §§ 941.30(2), 961.65, 961.67(2)(a) (2019-20).[2] The court dismissed and read into the record the other seven counts for purposes of sentencing. The court sentenced Tuggle to a total term of twelve years of initial confinement and eight years of

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

extended supervision, followed by a two-year term of probation.[3] Tuggle appeals, challenging the circuit court's denial of his suppression motion.

## DISCUSSION

### I. Background Law and Standard of Review

¶9     The warrant clauses of the Fourth Amendment to the United States Constitution and article I, section 11 of the Wisconsin Constitution provide "particularized protections governing the manner in which search and arrest warrants are issued." *State v. Sveum*, 2010 WI 92, ¶20, 328 Wis. 2d 369, 787 N.W.2d 317; *State v. DeSmidt*, 155 Wis. 2d 119, 129-30, 454 N.W.2d 780 (1990). The functions of the warrant requirement are several, including "safeguarding citizens from unreasonable interference with privacy," "preventing individual privacy from being subjected to the whims of law enforcement officers," and "limiting the scope of the intrusion." *State v. Noll*, 116 Wis. 2d 443, 452-53, 343 N.W.2d 391 (1984).

¶10     To this end, a warrant must be based "upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." WIS. CONST. art. I, § 11; *State v. Marquardt*, 2001 WI App 219, ¶10, 247 Wis. 2d 765, 635 N.W.2d 188. This

---

[3] The court imposed consecutive sentences of five years of initial confinement and five years of extended supervision for the offense of recklessly endangering safety and seven years of initial confinement and three years of extended supervision for the offense of possession of methamphetamine manufacturing materials. The court also imposed two years of probation for the offense of possession of methamphetamine manufacturing waste.

The Honorable Jon M. Counsell decided Tuggle's suppression motion and entered his guilty pleas. The Honorable Lyndsey Brunette sentenced Tuggle.

standard requires a "neutral and detached magistrate" to determine probable cause to search by examining the totality of the circumstances, as described in the sworn testimony of the officer seeking the warrant. *Marquardt*, 247 Wis. 2d 765, ¶¶10-12; *Sveum*, 328 Wis. 2d 369, ¶22. "A finding of probable cause is a common-sense test": "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Ward*, 2000 WI 3, ¶21, 231 Wis. 2d 723, 604 N.W.2d 517 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Thus, broadly speaking, the warrant clause "require[es] only three things": (1) prior authorization by the magistrate, (2) probable cause to believe that the evidence sought in that location will aid in a particular conviction, and (3) a "particularized description" of the items sought and the places to be searched (the particularity requirement). *Sveum*, 328 Wis. 2d 369, ¶¶20, 24; *see also State v. Sloan*, 2007 WI App 146, ¶8, 303 Wis. 2d 438, 736 N.W.2d 189 (the inquiry is whether the warrant-issuing judge "was 'apprised of sufficient facts to excite an honest belief in a reasonable mind that the objects sought are linked with the commission of a crime, and that they will be found in the place to be searched'" (quoted source omitted)).

¶11 In furtherance of "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant," we employ a deferential standard in reviewing the probable cause determination of the warrant-issuing judge. *State v. Higginbotham*, 162 Wis. 2d 978, 990, 471 N.W.2d 24 (1991) (internal quotation marks and quoted source omitted). Our role on review is to "ensure that the judge had a substantial basis to conclude that probable cause existed." *Marquardt*, 247 Wis. 2d 765, ¶13. We will therefore uphold the probable cause determination

"unless the defendant establishes that the facts are clearly insufficient to support a probable cause finding." *Id.*

## II. *Application to Tuggle's Appeal*

¶12   Tuggle contends that the search warrant fails in its entirety for two reasons.  First, he argues that the items sought were unconnected to the crime(s) then being investigated (burglary of and/or criminal trespass into J.S.'s shed).[4] *See* WIS. STAT. §§ 943.10(1m), (2) (burglary); 943.14 (criminal trespass to dwellings).  Second, he argues that there was no connection between the items sought and the locations to be searched (his residence and vehicle(s)).  Notably, Tuggle does not dispute that, if officers were lawfully in his residence to execute the warrant, seizure of the drug-related evidence was authorized pursuant to the plain view doctrine.  Under this doctrine, "objects falling within the plain view of an officer who has a right to be in the position to have the view are subject to valid seizure and may be introduced in[to] evidence." *State v. Buchanan*, 2011 WI 49, ¶23, 334 Wis. 2d 379, 799 N.W.2d 775 (internal quotation marks and quoted source omitted); *see also id.* (noting the following three requirements for application of the plain view doctrine: "(1) the evidence must be in plain view; (2) the officer must have a prior justification for being in the position from which [he or] she discovers the evidence in 'plain view'; and (3) the evidence seized in

---

[4] Tuggle appears to assume that law enforcement was investigating crimes against J.S. relating to both his entering J.S.'s property and his entering J.S.'s shed.  The State appears to assume that law enforcement was also investigating Tuggle's entering Y.A.'s property and his entering Y.A.'s garage.  Our analysis in this decision focuses on evidence to be seized pursuant to the warrant—black work gloves—pertaining only to crimes against J.S. (there is no evidence that Tuggle wore black work gloves when he entered Y.A.'s garage).  We therefore analyze the legal sufficiency of the search warrant solely as it relates to the investigation of Tuggle's burglary of, or criminal trespass to, J.S.'s shed.  The focus on probable cause as it relates only to these crimes does not affect the outcome of this case but helps frame our inquiry.

itself, or in itself with facts known to the officer at the time of the seizure, [must provide] probable cause to believe there is a connection between the evidence and criminal activity" (second alteration in original; internal quotation marks and quoted source omitted)).

¶13    The State concedes that some of the items described in the search warrant were unconnected to the crimes then being investigated.  The State maintains, however, that, under the severability doctrine, the drug-related evidence found in Tuggle's residence should not be suppressed.  *See Noll*, 116 Wis. 2d at 450-55 (adopting the severability doctrine, which permits the court to uphold the valid portions of a partially defective warrant).  Tuggle, for his part, disputes the application of the severability doctrine in this context, for reasons we discuss below.

¶14    It is axiomatic that, to apply the severability doctrine, some portion of the search warrant must be valid.  *See id.*  Therefore, we first explain why the search warrant was valid insofar as it authorized a search for a pair of black work gloves in Tuggle's residence and vehicles.  Second, we examine whether the severability doctrine applies here, such that we may uphold the seizure of drug-related evidence found in plain view during the search for the gloves.  We conclude that application of the severability doctrine is both permissible and appropriate.

A.  The search warrant was valid with respect to the search for black work gloves in Tuggle's residence and vehicles

¶15    Tuggle argues that there was no probable cause with respect to both the items to be seized and the locations to be searched.  We address each argument separately.

9

*1. Probable cause to believe that items described in the warrant were connected with the crimes*

¶16    As stated, the warrant authorizes a search for the following items used in the commission of, or which may constitute evidence of, burglary or criminal trespass to J.S.'s shed: (1) human tissue and bodily fluids; (2) tools that may have been used in the commission of a crime; (3) stolen items, "proceeds of criminal activity[,] specifically[,] theft of removable property from a dwelling of another," and any other contraband; (4) notes, writings, and other information detailing criminal activity; (5) vehicles owned by Elizabeth or Tuggle and present at the residence; (6) any forms of identification; (7) cell phones, electronic storage devices "including the data therein," and GPS units; and (8) a pair of black work gloves.

¶17    Tuggle argues that there was no probable cause to believe that any of these objects were connected with the crimes then being investigated. The State, in turn, concedes there was no probable cause to believe that items (1) through (3) were connected to those crimes. We independently agree with, and therefore accept, the State's concessions. As the State acknowledges, there was no information presented to the warrant-issuing judge that would allow for the conclusion or reasonable inference that Tuggle's biological material was recovered from the scene of the crime, that items were stolen from J.S.'s shed, or that tools were used to enter the shed. Therefore, there was no probable cause to search for or collect these items from Tuggle's residence or vehicles. These items should not have been sought in the warrant application and should not have been included in the warrant.

¶18    The State does not address Tuggle's arguments that there was no probable cause to search for items (4) and (5)—notes/writings/other information

detailing criminal activity and vehicles ("vehicles" here being an item to be searched for, not a location to be searched). The State, moreover, argues that there *was* probable cause to search for items (6) through (8): forms of identification, cell phones/electronics, and the black work gloves.

¶19     For purposes of this decision, we need not decide whether there was a substantial basis for the probable cause determination with respect to items (4) through (7), described above. That said, we question the inclusion of certain items. For example, there is no indication in the affidavit requesting the search warrant that Tuggle wrote any notes about this particular crime, nor does there appear to be any basis for inferring as much. As to identification documents, officers had already viewed copies of Tuggle's and Elizabeth's driver's licenses— this is how officers located the Tuggles' address and verified that they lived there—so it may have been speculative for the warrant-issuing judge to simply assume (as the State argues he did) "that the recovery of [the] identification documents [themselves] on the property would assist in identifying ownership or control of other items found during the search." And as to the cell phones and electronics, it is potentially problematic, and raises a host of questions largely unexplored in the parties' briefing, to authorize entry into a suspect's home on the assumption that he or she owns a cell phone, that the cell phone itself (as opposed to the phone carrier's records) contains location information or other evidence of the crime, and that a search of the contents of the cell phone is or will ultimately be authorized. *See Riley v. California*, 573 U.S. 373, 401-03 (2014) (warrantless search of cell phone contents held unconstitutional). We need not decide these issues, however, because we will instead assume that the search for items (4)

11

through (7) was not supported by probable cause, such that these items should not have been included in the warrant.[5]

¶20 That leaves us with the final item described in the warrant: "black work gloves." We conclude that this item was supported by probable cause, in that it was reasonable for the warrant-issuing judge to believe that recovering this item would aid in convicting Tuggle of burglary or criminal trespass to J.S.'s shed. It is undisputed that photographs captured a male subject, wearing black work gloves, entering and leaving J.S.'s shed. Therefore, the warrant-issuing judge could have reasonably concluded that obtaining a pair of black work gloves in Tuggle's residence would help prove that Tuggle was, in fact, the person in the photographs.

¶21 Tuggle's arguments about the black work gloves center on their perceived lack of probative value. According to Tuggle, "[f]inding black gloves would do nothing to aid in convicting" him, both because most people in Wisconsin own this item and because "the gloves had no special features which would have distinguished them to prove they were the ones worn in the shed." This argument is conclusory. It is not necessarily true that most Wisconsinites

---

[5] As stated, aside from the drug-related evidence and two pairs of gloves, law enforcement seized a letter establishing Tuggle's residence and various electronic devices, including cell phones. Tuggle does not argue that the seizure of the letter or electronic devices affected his decision to plead guilty. Rather, the thrust of Tuggle's briefing is that all evidence (primarily, drug-related evidence) must be suppressed because law enforcement seized this evidence during the execution of an invalid search warrant. Accordingly, we need not consider whether the seizure of the letter and electronic devices was supported by probable cause for the *separate purpose* of evaluating a plea-withdrawal claim. *See State v. Tillman*, 2005 WI App 71, ¶18, 281 Wis. 2d 157, 696 N.W.2d 574 ("[T]he court's role in a conventional appeal is limited to addressing the issues briefed by appellate counsel."); *State v. Semrau*, 2000 WI App 54, ¶¶21-26, 233 Wis. 2d 508, 608 N.W.2d 376 (applying a harmless-error analysis to a defendant's decision to plead guilty following the denial of his motion to suppress evidence).

own black gloves or, specifically, black *work* gloves, as Tuggle asserts. Nor has Tuggle shown that the gloves "would do nothing to aid" in securing a conviction. A search warrant need not be confined to those items with demonstrably high probative value; the standard is whether there is "probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense." *Sveum*, 328 Wis. 2d 369, ¶22 (internal quotation marks and quoted source omitted). Tuggle has not pointed to, and we have not identified, any authority establishing that we must weigh an item's ultimate degree of probative value in assessing probable cause. We will not second-guess the warrant-issuing judge's implicit determination that recovering these gloves would strengthen the case against Tuggle.

¶22 Tuggle further implies that the search for black work gloves was improper because "the police had already identified Mr. Tuggle as the person they believed entered the alleged victim's shed." Thus, according to Tuggle, law enforcement "did not need any additional evidence to question or arrest Mr. Tuggle." But Tuggle, again, does not cite any authority to support his argument, and we have not independently identified any authority stating that the validity of a search warrant depends on the quantity or quality of evidence already gathered. As the circuit court put it, "when it comes to proof beyond a reasonable doubt, there is no such thing as having too much evidence." Given our deferential standard of review in assessing probable cause, we cannot conclude that the available "facts [we]re clearly insufficient to support a probable cause finding." *See Marquardt*, 247 Wis. 2d 765, ¶13; *see also Higginbotham*, 162 Wis. 2d at 990 ("[T]he resolution of doubtful or marginal cases regarding a warrant-issuing judge's determination of probable cause should be largely determined by the

strong preference that law enforcement officers conduct their searches pursuant to a warrant.").

¶23 We conclude that the search warrant was valid with respect to at least one item: a pair of black work gloves. We now turn to whether Tuggle's residence and vehicles were proper locations to be searched for those gloves.

> 2. *Probable cause to believe that the black work gloves would be located in the residence or vehicles*

¶24 Tuggle argues that "[t]he warrant lacked probable cause because there was no nexus between the places to be searched and the items sought." In Tuggle's view, the trail camera footage was "not enough to establish a … factual connection between those gloves and" his residence or vehicles. Tuggle appears to argue that police should have taken some additional investigative step to show that the gloves were likely to be found in these locations. We disagree.

¶25 There is no bright-line rule for determining whether there is probable cause to search a particular location for a given item. The inquiry is simply whether it is "reasonable to believe in the circumstances" that the evidence "is likely to be in a particular location." *State v. Tompkins*, 144 Wis. 2d 116, 125, 423 N.W.2d 823 (1988). It is not necessary that law enforcement pinpoint one location where evidence is *most* likely to be found, and the search of one location may be appropriate even where probable cause also supports a search in a second or third location. *Id.* The inquiry may, and often does, rest on reasonable inferences from the facts presented. *Ward*, 231 Wis. 2d 723, ¶28. And "[w]here the object of the search is … clothing worn at the time of the crime, the inference that the items are at the offender's residence [may be] especially compelling, at least in those cases where the perpetrator is unaware that the victim has been able

14

to identify him to the police." 2 WAYNE R. LAFAVE ET AL., SEARCH & SEIZURE § 3.7(d) (6th ed. 2021). As the Seventh Circuit Court of Appeals stated, "[W]hat more likely place to find a suspect's clothes than his own home?" *See United States v. Aljabari*, 626 F.3d 940, 946 (7th Cir. 2010).

¶26 None of this is to say that evidence, or even clothing worn, is *always* likely to be found in a suspect's residence. But Tuggle has not demonstrated why it was unreasonable for the warrant-issuing judge to draw this conclusion. According to the search warrant affidavit, Tuggle was living at that address (as noted, Deputy Ruggles visited the residence and observed Tuggle there; Tuggle's driver's license also listed that address). Also as noted, generally speaking, clothing is found in a person's home. Moreover, there is no indication in the record that, prior to the search, Tuggle had any reason to believe that law enforcement sought his gloves as part of a criminal investigation. Therefore, there is no reason to believe that Tuggle would have disposed of the gloves or hidden them outside his home. Accordingly, the facts were not "clearly insufficient" to demonstrate probable cause to search for the gloves in Tuggle's residence. *See Marquardt*, 247 Wis. 2d 765, ¶13.

¶27 Along similar lines, we conclude that the search warrant properly authorized officers to search Tuggle's vehicles for the gloves. Gloves are the type of small, portable item that people often leave or keep in their vehicle. In addition, there are no particular facts pointed out by Tuggle making the gloves' location in either vehicle unlikely (there are no facts showing, for example, that Tuggle did not use one of these vehicles). Again, a warrant need not identify the only or most likely location of evidence. *Tompkins*, 144 Wis. 2d at 125. We conclude that probable cause supported a search for black work gloves in both vehicles.

¶28 In arguing to the contrary, Tuggle directs us to *Sloan* and *Marquardt*, two cases in which this court determined that probable cause to search a location was lacking. These cases are factually inapposite. In *Sloan*, we concluded that a suspect's mailing marijuana to a Florida address did not provide probable cause to search his residence for marijuana or paraphernalia. *Sloan*, 303 Wis. 2d 438, ¶¶2-5, 28-32. "[C]ritical to our analysis" was that there was no evidence in the search warrant affidavit showing that criminal activity was occurring, or evidence could be found, *in the residence*. *Id.*, ¶¶31-32. Here, in contrast, the warrant authorized law enforcement to search for an identified piece of clothing in those locations where it was reasonable for that clothing to be found. Nor was it necessary, as Tuggle argues, for law enforcement to "observe work gloves at [his] home" or "establish that [he] owned such gloves." Law enforcement had pictures of Tuggle potentially committing a crime while wearing black work gloves. Thus, there was a substantial basis for the warrant-issuing judge to infer, several weeks later, that Tuggle still possessed those gloves in his residence or vehicles.

¶29 Tuggle further points us to *Marquardt*. In that case, we concluded that facts indicating that the suspect may have killed the victim in the victim's home did not provide probable cause to search the suspect's residence. *Marquardt*, 247 Wis. 2d 765, ¶¶3-4, 14-19. We noted that the facts might reasonably have supported further investigation *of the suspect*; however, there were no facts tying the suspect's residence to the homicide or indicating that evidence or instrumentalities of the homicide were located in the residence. *Id.*, ¶19. Again, and in contrast, a reasonable inference here was that an item indisputably connected to the crimes then being investigated was likely to be found in Tuggle's residence or vehicles.

16

¶30     Because we conclude that the warrant validly authorized a search for black work gloves in Tuggle's residence and vehicles, we next consider whether to apply the severability doctrine in these circumstances.

B.  Application of the severability doctrine

¶31     The severability doctrine allows a court to uphold the valid portions of a partially defective warrant.  *See Noll*, 116 Wis. 2d at 454-55; *Marten*, 165 Wis. 2d 70, 76-77, 477 N.W.2d 304 (Ct. App. 1991).  A purpose of the severability doctrine is to permit the seizure and admission of evidence pursuant to the valid portion of the search warrant.  *See Noll*, 116 Wis. 2d at 455 ("[A]s to those items discovered in the lawful execution of the valid part of the warrant, the Fourth Amendment does not require suppression."); 2 LAFAVE, SEARCH & SEIZURE § 3.7(d) ("If severability is proper … it would seem the rule would be [best] expressed … in terms of what search and seizure would have been permissible if the warrant had only named those items as to which probable cause was established.").  The *Noll* court concluded that application of the severability doctrine "best accommodated" the "two interests" at stake—"the government's obligation to enforce its laws … and the citizen's right to be secure in his person, house, papers and effects from unreasonable government intrusion."  *Noll*, 116 Wis. 2d at 454.

¶32     Tuggle appears to raise two arguments as to why the severability doctrine does not apply.  First, he argues that "the severability doctrine discussed in *Noll* is specifically about violations of the particularity requirement" and is thus inapplicable here, where "Tuggle is not asserting that the items police sought were not particularly identified."  This is too narrow a reading of our case law.  It is true that *Noll* adopted and employed the severability doctrine to address the lack of a

17

particularized description of certain items. *See id.*, at 450-55. But in *Marten*, 165 Wis. 2d at 76-77, this court, citing *Noll*, employed the severability doctrine where probable cause was arguably lacking as to certain locations to be searched. Thus, we concluded that the portion of the warrant authorizing a search of the suspect's yard and outbuildings could be severed, and evidence seized from the house admitted. *Marten*, 165 Wis. 2d at 77. It follows from *Marten* that we may apply the severability doctrine to address the defect identified here: the lack of probable cause with respect to certain items to be seized.

¶33 Tuggle's second argument is more general: that "[a] warrant that so blatantly disregards the facts of the case and seeks to search for things not at all related to the crime should not be approved under the Fourth Amendment." According to Tuggle, "[s]uch approval sets a dangerous precedent that allows for police to rummage in people's personal lives without any legitimate reason to do so."

¶34 Courts within and outside of Wisconsin have addressed the inherent tensions in the severability doctrine. The warrant requirement exists in part to "limit[] the scope of the intrusion" into personal privacy. *Noll*, 116 Wis. 2d at 452-53. Thus, the severability doctrine should not become the means of inviting "an indiscriminate rummaging through" a suspect's personal property. *Id.* at 452-53, 456. But this tension is best resolved by scrutinizing how the incriminating evidence was actually located and seized: "the appropriate remedy in cases involving a search conducted under a partially valid warrant which exceeds the lawful scope is to admit those items discovered in the course of the execution of the lawful part of the warrant and to suppress the items that were not." *Id.* at 459. Severability, moreover, "is inappropriate when the valid portions of the warrant

may not be meaningfully severable from the warrant as a whole." *See id.* at 455 (citing *United States v. Christine*, 687 F.2d 749, 754 (3rd Cir. 1982)).

¶35 Here, Tuggle has not argued that the valid portion of the warrant cannot be meaningfully separated from the remainder of the warrant. Additionally, and crucially, Tuggle has not argued that drug-related evidence was discovered during the execution of the invalid portion of the warrant. Nor does Tuggle argue that any of the drug-related evidence must be suppressed if officers were lawfully in his residence. Rather, as previously stated, Tuggle appears to concede, and the record reflects, that drugs, paraphernalia, and evidence of drug manufacturing were in plain view. Thus, the undisputed facts show that law enforcement would have located the same drug-related evidence had it executed a search warrant solely for a pair of "black work gloves." In such case, "[t]he cost of suppressing *all* the evidence seized, including that seized pursuant to the valid portions of the warrant, is [too] great." *See Noll*, 116 Wis. 2d at 454 (internal quotation marks and quoted source omitted). We conclude that the severability doctrine applies here.

## CONCLUSION

¶36 For these reasons, we uphold the circuit court's denial of Tuggle's suppression motion and affirm the judgment of conviction.[6]

---

[6] Because we conclude that at least one item in the warrant was supported by probable cause, we do not address the parties' arguments as to whether the *Leon* good-faith exception might permit the admission of evidence seized in execution of an invalid warrant. *See United States v. Leon*, 468 U.S. 897, 922-23 (1984); *State v. Eason*, 2001 WI 98, ¶¶29-37, 63, 245 Wis. 2d 206, 629 N.W.2d 625.

19

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* Wis. Stat. Rule 809.23(1)(b)5.